| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA | |
|---|---|---|
| UNITED STATES OF AMERICA<br>v.<br><br>WILLIAM VICTOR, EDWARD VALENCIA,<br>and FEDERICO VALENCIA | DOCKET NO. | FILED<br>CLERK, U.S. DISTRICT COURT<br><br>MAR 18 2013<br><br>CENTRAL DISTRICT OF CALIFORNIA<br>BY                    DEPUTY |
| | MAGISTRATE'S CASE NO.<br>**13-0645M** | |

Complaint for violation of 21 U.S.C. §§ 331(k), 333(a)(1), 352(f)(1) and (2), and 353(b), and 18 U.S.C. §§ 2(a) and 2(b) [the doing of any act to a drug, namely, nitrous oxide, while the drug is held for sale after the drug's shipment in interstate commerce, which results in the drug being misbranded].

| NAME OF MAGISTRATE JUDGE<br>Paul L. Abrams | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br><br>Los Angeles, CA |
|---|---|---|

| DATE OF OFFENSE<br><br>April 3, 2009 and<br>November 23, 2012 | PLACE OF OFFENSE<br><br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN)<br>William Victor - 16708 Sunburst St., Northridge, CA<br>Edward Valencia - 3813 Lilita St., Lynwood, CA<br>Federico Valencia - 238 ½ West 41st, Los Angeles, CA |
|---|---|---|

Complainant's Statement of Facts Constituting the Offense or Violation:

**SEE AFFIDAVIT AND COUNT(S) LABELED AS ATTACHMENT A**

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
     **(See attached affidavit which is incorporated as part of this Complaint)**

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: None

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>Lisa Hartsell |
|---|---|
| | OFFICIAL TITLE<br>SPECIAL AGENT - United States Food and Drug Administration, Office of Criminal Investigation |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE<br>March 18, 2013 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

AUSA JOJ:se

ATTACHMENT A TO CRIMINAL COMPLAINT

[21 U.S.C. §§ 331(k), 333(a)(1), 352(f)(1) & (2), and 353(b);

18 U.S.C. §§ 2(a), 2(b)]

On or about and between April 3, 2009 and on or about November 23, 2012, in Los Angeles County, within the Central District of California, and elsewhere, defendants WILLIAM VICTOR, EDWARD VALENCIA, and FEDERICO VALENCIA, did dispense a prescription drug, namely, nitrous oxide, without a prescription and without required labeling, thereby causing the drug to be misbranded after shipment in interstate commerce.

\* \* \* \* \*

On or about and between the dates listed above, in Los Angeles County, within the Central District of California, and elsewhere, defendants WILLIAM VICTOR, EDWARD VALENCIA, and FEDERICO VALENCIA, did knowingly and willfully aid, abet, counsel, command, induce, procure, and cause the commission of the offense alleged above.

# AFFIDAVIT

I, Lisa Hartsell, being duly sworn, declare and state as follows:

## I.    INTRODUCTION

1.    I am a Special Agent for the U.S. Food and Drug Administration ("FDA") Office of Criminal Investigations ("OCI") in San Clemente, California. I have been employed by the OCI since October 1997. Prior to my employment with the OCI, I was employed by the U.S. Department of Commerce's Office of Export Enforcement for 13 years. I am currently responsible for conducting criminal investigations of violations of Titles 18 and 21 of the United States Code. During my employment with FDA/OCI, I have been involved in criminal investigations involving the distribution of counterfeit and unapproved drugs, and misbranded and/or adulterated products in violation of Title 21, United States Code, as well as violations of the Federal Anti-Tampering Act, Title 18, United State Code, Section 1365; violations of the Prescription Drug Marketing Act, Title 21, United States Code, Section 331(t), and other health care fraud investigations. I am a graduate of the Federal Law Enforcement Training Center and the University of California, and have participated in and directed the conduct of numerous search warrants at a variety of premises including residences and businesses. The majority of these search warrants have involved the seizure of computers and related equipment.

## II.    PURPOSE OF AFFIDAVIT

2.    This affidavit is submitted in support of criminal complaints and applications for arrest warrants for ROSE MARIE CUELLAR, WILLIAM VICTOR, EDWARD VALENCIA, and FEDERICO VALENCIA (collectively "TARGET INDIVIDUALS") for criminal violations of the federal Food, Drug, and Cosmetic Act, specifically, the doing of any act to a drug, namely, nitrous oxide, while the drug is held for sale after the drug's shipment in interstate commerce,

which results in the drug being misbranded, in violation of 21 U.S.C. § 331(k) and 333(a)(1), and 18 U.S.C. §§ 2(a) and (b). A chart summarizing the evidence against each defendant is attached to this affidavit as Exhibit 1.

      3.    This affidavit is also submitted in support of an application for search warrants commanding any agent of the FDA/OCI, with appropriate assistance from the investigative and technical staff of the Los Angeles Sheriff's Department ("LASD"), to search the below listed premises (collectively "THE TARGET BUSINESSES"), each further described in Attachment A to this affidavit, for the fruits, instrumentalities, and evidence of violations of 21 U.S.C. §§ 331(k), 333(a)(1), 352(f)(1) & (2), and 353(b), and 18 U.S.C. §§ 2(a) and (b) (the doing of any act to a drug, namely, nitrous oxide, while the drug is held for sale after the drug's shipment in interstate commerce, which results in the drug being misbranded), as further described in Attachment B to this affidavit. A chart summarizing the evidence in support of each search warrant is attached to this affidavit as Exhibit 2.

      a.    The premises of CUSTOM PERFORMANCE, located at 115 East Gardena Boulevard, #1B, Gardena, California ("CUSTOM PERFORMANCE #1")

      b.    The premises of CUSTOM PERFORMANCE, located at 8540 Sepulveda Boulevard, #1A, North Hills, California ("CUSTOM PERFORMANCE #2").

      c.    The premises of MIDNIGHT SPEED SHOP, located at 21422 Alameda Street, Carson, California.

      d.    The premises of NITROUS TURBO SYSTEMS, located at 10372 Trask Avenue, #D, Garden Grove, California.

      e.    The premises of CM RACING, located at 11616 Center Street, South Gate, California.

  f.  The premises of BPG AUTO PARTS, INC., located at 419 West 17th Street, #A, Santa Ana, California.

  g.  The premises of BPG PERFORMANCE, located 16303 1/2 Piuma Avenue, Cerritos, California.

  h.  The premises of N2O AUTO SUPPLY, located at 7221 Garden Grove Boulevard, #C, Garden Grove, California.

  i.  The premises of MAX SPEED NITROUS SUPPLY, located at 1550 West 6th Street, #102, Corona, California.

  j.  The premises of CALIFORNIA TOOL AND WELDING SUPPLY, LLC, located at 201 Main Street, Riverside, California ("CALIFORNIA TOOL – RIVERSIDE")

  k.  The premises of CALIFORNIA TOOL AND WELDING SUPPLY, LLC, located at 1004 East First Street, Santa Ana, California ("CALIFORNIA TOOL – SANTA ANA").

  l.  The premises of LA RUSH, INC., located at 13556 Pumice Street, Norwalk, California ("LA RUSH #1").

  m.  The premises of LA RUSH, INC., located at 5717 Malabar Street, Huntington Park, California ("LA RUSH #2").

  n.  The premises of ADVANCED GAS PRODUCTS, INC., located at 7552 Reynolds Circle, Huntington Beach, California.

  o.  The premises of SANTA ANA SPEED, located at 120 South Broadway Avenue, Santa Ana, California.

  p.  The premises of SPEEDWERKS, INC., located at 5422 South Normandie Avenue, Los Angeles, California.

4.    Finally, this affidavit is submitted in support of an application for search warrants commanding any agent of the FDA/OCI, with appropriate assistance from the investigative and technical staff of the Los Angeles Sheriff's Department ("LASD"), to search the below listed vehicles, each further described in Attachment A to this affidavit, for the fruits, instrumentalities, and evidence of violations of 21 U.S.C.§§ 331(k), 333(a)(1), 352(f)(1) & (2), and 353(b), and 18 U.S.C. §§ 2(a) and (b) (the doing of any act to a drug, namely, nitrous oxide, while the drug is held for sale after the drug's shipment in interstate commerce, which results in the drug being misbranded), as further described in Attachment B to this affidavit. A chart summarizing the evidence in support of each vehicle search warrant is attached to this affidavit as Exhibit 3.

a.    A 2006 International truck bearing California License Plate 8P14461 ("SUBJECT VEHICLE 1").

b.    A 1974 semi-trailer bearing Nevada License Plate 48607T  ("SUBJECT VEHICLE 2").

c.    A 2005 International truck bearing California License Plate 7J05705 ("SUBJECT VEHICLE 3").

d.    A 2006 International truck bearing California License Plate 7Z42153 ("SUBJECT VEHICLE 4").

e.    A 2009 International tractor trailer truck bearing California License Plate 9A96371 ("SUBJECT VEHICLE 5").

f.    A 2002 International truck  bearing California License Plate 6U43994 ("SUBJECT VEHICLE 6").

g.    Freightliner Cascadia bearing Indiana License Plate 2018299 ("SUBJECT VEHICLE 7").

     h.     A 2006 Hino panel truck bearing California License Plate 7V87707 ("SUBJECT VEHICLE 8").

     i.     A 2005 GMC truck California License Plate 8T57075 ("SUBJECT VEHICLE 9").

     5.     Unless otherwise noted, the information contained in this affidavit is based upon my personal knowledge and investigation of the above described offenses, the review of evidence obtained during the course of this investigation that includes information disclosed to me by other agents, investigators, chemists, and auditors, and my experience and background as a special agent for the FDA/OCI.

### III.    THE REGULATORY BACKGROUND

**A.    FEDERAL FOOD, DRUG, AND COSMETIC ACT**

     6.     The FDA is the agency of the United States responsible for enforcing the provisions of the Federal Food, Drug, and Cosmetic Act ("FD&C Act"), 21 U.S.C. § 301 et seq. Among the purposes of the FD&C Act is to ensure that drugs sold for administration to humans, or for other use by or on humans, provide reasonable assurances of safety and effectiveness, and bear labeling containing only true and accurate information.

     7.     21 U.S.C. § 331(a) prohibits the introduction or delivery for introduction into interstate commerce of any drug that is misbranded.

     8.     A "drug" includes articles that are intended to affect the structure or function of the body of man.  21 U.S.C. § 321(g)(1)(C).

     9.     Certain drugs may only be dispensed upon a written prescription, specifically, drugs "intended for use by man which, [ ] because of its toxicity or other potentiality for harmful effect, or the method of its use is not safe for use except under the supervision of a practitioner licensed by law to administer such drugs." 21 U.S.C. § 353(b)(1).

10.    "[T]he intended use of a product, within the meaning of the [FD&C Act], is determined from its label, accompanying labeling, promotional claims, advertising, and <u>any other relevant source</u>." (<u>United States v. Travia</u>, 180 F. Supp.2d 115, 119 (D.D.C. 2001) (emphasis in original). The intended use "may be shown by the circumstances that the article is, with the knowledge of [the seller] or their representatives, offered and used for a purpose for which it is neither labeled nor advertised." 21 C.F.R. § 201.128.

11.    Nitrous oxide is a prescription drug. <u>See</u> Prescription Drug Marketing Act of 1987; Prescription Drug Amendments of 1992; Policies, Requirements, and Administrative Procedures, 64 Fed. Reg. 67720, 67722 (Dec. 3, 1999); see also <u>Travia</u>, 180 F.Supp.2d at 119 (nitrous oxide sold for inhalation without labeling or prescription to individuals at rock concert was a misbranded drug under FD&C Act).

12.    Under the FD&C Act, dispensing a prescription drug without a valid prescription is an act which results in the drug being misbranded while held for sale. 21 U.S.C. § 353(b).

13.    In addition, under the FD&C Act, a drug is deemed to be misbranded if, among other things, its labeling:

     a.    is false or misleading in any particular (21 U.S.C. § 352(a)); or

     b.    (1) lacks adequate directions for use by a layperson; or (2) adequate warnings against use in those pathological conditions or by children where its use may be dangerous to health, or against unsafe dosage or methods or duration of administration or application, in such manner or form, as were necessary for the protection of users. 21 U.S.C. § 352(f)(1) and (2)).

14.     Under the FD&C Act, it is unlawful to do any act to a drug, while the drug is held for sale, after the drug's shipment in interstate commerce, which results in the drug being misbranded. 21 U.S.C. § 331(k).

15.     The interstate commerce requirement for a 21 U.S.C. § 331(k) "misbranding" violation is satisfied when an ingredient or component used to make a drug is transported in interstate commerce prior to manufacture or assembly of the drug. Baker v. United States, 932 F.2d 813, 814-815 (9th Cir. 1991) (wholly intrastate sales of synthetic heroin in California violate 21 U.S.C. § 331(k) misbranding where ingredients/components used to make synthetic heroin were shipped in interstate commerce).

16.     In addition, the FD&C Act provides that "[i]n any action to enforce the requirements of this Act respecting a device, food, drug, tobacco product, or cosmetic the connection with interstate commerce required for jurisdiction in such action shall be presumed to exist." 21 U.S.C. § 379a.

17.     The FD&C Act does not contain a scienter requirement for misdemeanor violations. Roseman v. United States, 364 F.2d 18, 24 (9th Cir. 1966). Criminal violations that do not require scienter are strict liability offenses. Misdemeanor violations of the FD&C Act dispense with the conventional requirement of "awareness of wrongdoing" because they "touch phases of the lives and health of the people which, in the circumstances of modern industrialism, are largely beyond self-protection." United States v. Dotterweich, 320 U.S. 277, 280, 64 S.Ct. 134, 136 (1934). "An article may be misbranded pursuant to the misdemeanor provision 'without any conscious fraud at all,' thus creating a form of strict criminal liability." United States v. Watkins, supra, 278 F.3d at 964. The government must prove, however, that the defendant's intended use of the nitrous oxide, as demonstrated by the totality of the

7

circumstances, was to affect the structure or function of the human body. 21 U.S.C. § 21(g)(1)(C); 21 C.F.R. § 201.128; Travia, 180 F. Supp.2d at 115 (finding that in that case, the defendant's intent was to sell the nitrous oxide to affect "the structure or any function of the body of man," and therefore the nitrous oxide was a "drug" for purposes of the Act.)

## B.   CALIFORNIA STATE LAW

18.   California Penal Code § 381b states that a person who possesses nitrous oxide with the intent to breath, inhale, or ingest it for the purpose of causing a condition of intoxication is guilty of a misdemeanor.

19.   California Penal Code § 381c states that a person who sells, furnishes, distributes or offers to sell, furnish, or distribute, a canister, tank, or receptacle containing nitrous oxide to a person under 18 years of age is guilty of a misdemeanor.

## IV.   <u>OVERVIEW OF INVESTIGATION</u>

20.   This affidavit concerns a broad distribution network of the gas nitrous oxide for inhalation as a recreational drug. The TARGET BUSINESSES purport to sell nitrous oxide for use in welding or for use in high performance or racing "booster" kits. The investigation demonstrations, however, that almost all the end users of the nitrous oxide sold by the TARGET BUSINESSES inhale the nitrous oxide. The investigation demonstrates that the TARGET BUSINESSES and TARGET INDIVIDUALS know that the nitrous oxide will be used by customers as a recreational drug. Finally, the investigation demonstrates that the TARGET BUSINESSES and TARGET INDIVIDUALS are selling and distributing nitrous oxide without a prescription and in containers that do not include proper labels.

## V.   <u>GENERAL STATEMENT OF PROBABLE CAUSE</u>

21.   As set forth in more detail below, there is probable cause to believe that each of the TARGET BUSINESSES has distributed nitrous oxide. Indeed, many of the TARGET

BUSINESSES advertise the sale of nitrous oxide. The agents have observed customers walking out of many of the TARGET BUSINESSES carrying cylinders that are consistent with cylinders that contain nitrous oxide. In some instances, customers stated that they had purchased nitrous oxide from a TARGET BUSINESS.

22. There is also probable cause to believe that the TARGET BUSINESSES distributed the nitrous oxide without adequate labels. I did not observe a label on any of the cylinders that had been sold by the TARGET BUSINESSES to customers. Moreover, because the TARGET BUSINESSES purport to operate as gas distributors, a welding company, or auto supply company, it is reasonable to infer that they do not include adequate labels on the cylinders.

23. There is probable cause to believe that the TARGET BUSINESSES distributed nitrous oxide without a prescription. First, because each of the TARGET BUSINESSES operate as a gas distributor, an auto supply company, or welding company, they could not have been filling prescriptions. Moreover, in California, only licensed pharmacies can fill prescriptions. On March 5, 2013, I conducted a search on www.pharmacy.ca.gov and confirmed that none of the TARGET BUSINESSES had obtained a license to operate a pharmacy in California. Moreover, I conducted a license verification at www.rn.ca.gov, www.dbc.ca.gov, www.mbc.ca.gov, www.ombc.ca.gov, www.naturopathic.ca.gov, www.optometry.ca.gov, www.bpm.ca.gov, and www.vmb.ca.gov, and confirmed that none of the TARGET BUSINESSES had obtained a license to conduct a pharmacy in California. Moreover, I concluded that none of the TARGET INDIVIDUALS was licensed with the Board of Registered Nursing, the Dental Board of California, the Medical Board of California, the Osteopathic Medical Board of California, the Naturapathic Medicine Committee, the Board of Optometry,

the Board of Podiatric Medicine, or the Veterinary Medical Board. Therefore, none of the TARGET INDIVIDUALS was licensed to write a prescription in California.

24. Finally, I submit that there is probable cause to believe that each of the TARGET INDIVIDUALS knew that nitrous oxide they sold was intended to be inhaled as a recreational drug and that evidence of the violations of the FD&C will be found at the TARGET BUSINESSES. I submit that the following evidence demonstrates such knowledge:

a. Some of the TARGET BUSINESSES purport to operate as a welding company. Yet as set forth below, there is no legitimate need to use nitrous oxide in welding.

b. Some of the TARGET BUSINESSES purport to operate as automotive supply companies but do not carry any such stock of (they usually have a couple on display) automotive supply parts. That such businesses advertise items they do not carry suggests that they are trying to mislead the police or regulators. It further suggests that the TARGET BUSINESSES know that the nitrous oxide will be inhaled as a drug rather than used in welding or auto racing.

c. The TARGET BUSINESSES offer a variety of different-sized tanks for sale to customers, including 5, 10, 20, and 30 pound tank/cylinders. Moreover, customers almost always leave the TARGET BUSINESSES carrying just one tank. Customers also leave carrying a variety of different sized tanks, including large tanks that would be too cumbersome to use in a race car. As set forth in more detail below, customers who purchase nitrous oxide for racing generally use multiple 10 pound tanks. It is reasonable to infer that store owners who purport to sell nitrous oxide for use in race cars should know the conventional size and number of cylinders used in racing.

    d.      Many of the TARGET BUSINESSES sell a high volume of nitrous oxide tanks at night, primarily on Friday and Saturday nights. I submit that the owners of such TARGET BUSINESSES know, based on the volume of sale, that the nitrous oxide is not being used for legitimate purposes.

    e.      The TARGET BUSINESSES are open at hours that are not consistent with legitimate automotive parts or repair industry hours. Many do not open until noon and do not close until between 8:00 p.m. and 12:00 a.m. The businesses are always open late into the night on Friday and Saturday nights. While certain large chain auto parts stores are open late at night, I submit that it is unusual for legitimate retail stores to both open and close late. Rather, these hours are consistent with the sale of nitrous oxide to customers for the purpose of inhalation as a recreational drug, whether in a private setting or at underground parties. I know, based on my training and experience, that most inhalation of recreational drugs occurs on weekends and in the evenings.[1]

    f.      Every surveillance during the conduct of this investigation has shown multiple customers carrying empty cylinders of various sizes into the TARGET BUSINESSES, and exiting these businesses carrying filled cylinders. The ability to discern empty from filled is

---

[1] During the evening hours, a "security guard" is often present at the businesses. In addition many of the TARGET BUSINESSES have installed security cameras. The cameras are generally located above the door through which the nitrous oxide is delivered and above the front door through which customers enter the businesses. While there are legitimate business reasons to maintain a security guard and security camera, I formed the opinion that the existence of such precautions at the TARGET BUSINESSES suggested that the businesses were aware that customers present at their store were engaged in the use of recreational drugs and prone to violence. Indeed, as set forth below, one business owner, WILLIAM VICTOR, stated that he hired a security guard for his store because of the "crazy kids." Moreover, at least one of the TARGET BUSINESSES had a murder occur on its doorstep. The shooter was a customer who was purchasing nitrous oxide. Based on my training and experience, recreational drugs such as nitrous oxide are often associated with violence.

based on the weight of the cylinders being carried. The method of carrying when leaving the TARGET BUSINESSES including the leaning of the body, the extended arm, the use of a "bear hug" style carry, and the fact that on at least one occasion, the cylinder was too heavy for the female to carry and an employee was observed carrying the filled cylinder to her vehicle.

## A.   NITROUS OXIDE GAS, DANGERS, AND USES

25.     Based upon my training, experience, research, and investigation of this matter, I am aware that nitrous oxide is a general anesthetic and analgesic drug used by doctors and dentists to produce loss of consciousness before and during surgery. The method of delivery to the human system is inhalation. Nitrous oxide is also used illegally as a recreational drug to create a temporary, euphoric rush. At high and prolonged exposure levels, nitrous oxide is an asphyxiant. Illegal use of the drug can lead to death from lack of oxygen or asphyxia. Illegal use of nitrous oxide can also lead to spasms, convulsions, and other health related issues.

26.     On March 9, 2009, I spoke with Michael Tiller from the Compressed Gas Association. Tiller advised me that many distributors that sell nitrous oxide to customers involved in the automotive field denature the nitrous oxide by adding sulfur (in the form of sulfur dioxide) prior to sale, in order to prevent inhalation.

27.     I have also reviewed numerous online posts regarding the inhalation of nitrous oxide that has been denatured with sulfur dioxide. If nitrous oxide has been denatured with sulfur dioxide, users refer to the gas has having the "stink." In reverse, if the nitrous oxide has not been denatured with sulfur it is commonly referred to as "clean."

## B.   NITROUS OXIDE IN WELDING

28.     I have learned from information provided by Praxair, a gas manufacturer, at www.praxair.com, that metal fabrication gases used in welding do not generally include pure nitrous oxide. Gases used in the welding industry generally consist of Acetylene, Argon,

Helium, Nitrogen, Oxygen, and Carbon Dioxide. I reviewed Patent Number 5,609,783 at the www.uspto.gov that identified the inclusion of nitrous oxide in an Argon Helium mixture at a rate of 80 to 250 parts per million (ppm) for use in welding, however, any amount greater than 250 ppm resulted in detrimental discoloration of the seam during TIG welding and sag in MIG welding.

29.    On March 1, 2013, I spoke with Tom Siewert, a Director at Large with the American Welding Society. Mr. Siewert holds a B.S. in Applied Math and Physics, a M.S. in Materials Science, and a Ph.D. in Metallurgy. Mr. Siewert is currently a consultant in the areas of welding and mechanical testing. Between 1984 and 2010, he worked for the United States Department of Commerce, National Institute of Standards and Technology within the Structural Materials Group, Materials Reliability Division. Mr. Siewert told me the following:

a.    Nitrous oxide is not used in welding as a fuel for welding devices or torches;

b.    Nitrous oxide is not used as a shielding gas to prevent damage to the metal materials subject to welding;

c.    In addition to his own direct experience, training, and knowledge, he has researched the American Welding Society archives and other sources, and he is unable to find any reference to the intentional addition of nitrous oxide to the gases used in welding.

C.    **NITROUS OXIDE AND RACING CAR BOOSTER KITS**

30.    I reviewed information published by Holley Performance Products, Inc. at the website www.holley.com. The company sells NOS-brand nitrous oxide kits for installation and use in automobiles driven for purposes of racing. In this instance, nitrous oxide is used to speed engines for automobile racing via cylinders and feeder units used to inject nitrous oxide into the carburetors. According to the FAQ on the website, the company sells only automotive grade

13

nitrous oxide called Ny-trous Plus. Ny-trous Plus contains a minimal amount of sulfur dioxide

(100 ppm) as a deterrent to substance abuse. Also according to this site the largest bottle sold for

use in the NOS systems is a 20 lb. bottle for $347.54. These bottles are approximately 31" tall

and bear a large orange NOS label that reads in part "nitrous oxide Mixture with Maximum 100

ppm Sulfur Dioxide" and includes the required Hazmat warning symbols for non-flammable

compressed gas that is an oxidizer.

## D.    INFORMATION FROM CONFIDENTIAL SOURCE NUMBER ONE

31.    On February 14, 2012, I interviewed Confidential Source Number One ("CS-1").

CS-1 has worked in a variety of positions within companies that are involved in the manufacture

and sale of compressed gas, including but not limited to oxygen, nitrogen, argon, carbon dioxide,

hydrogen, and nitrous oxide. CS-1 is known to me and has provided information during the

conduct of this investigation that I have corroborated. Based upon my factual corroboration of

information provided to me by CS-1 on prior occasions, I believe that information received from

CS-1 regarding the nitrous oxide and the compressed gas industry to be accurate and reliable.

32.    I am aware that CS-1 has a B.S. in Business with a minor in Chemistry. CS-1 has

been employed in a variety of positions within the compressed gas industry, including, as a

Chemical Technician, Product Manager, and in Marketing and Operations Manager positions for

Regional Specialty Gas. After CS-1's retirement, CS-1 started a consulting firm specializing in

providing assistance to compressed gas suppliers and distributors. I am informed and believe

that CS-1 has a detailed familiarity with the manufacturing, distribution, and sale of compressed

gases in the United States, including but not limited to oxygen, nitrogen, argon, carbon dioxide,

hydrogen and nitrous oxide. CS-1 has previously been involved with the Gases and Welding

Distributors Association and the Compressed Gas Association, and is aware of the associations'

concerns with the misuse of nitrous oxide (e.g., human consumption as a recreational drug). CS-

1 has also written extensively on safety and operational issues applicable to compressed gas distributors. CS-1 currently consults for a compressed gas distributor that sells nitrous oxide, located in Long Beach, California.

33.    CS-1 has recently advised me that Airgas and Air Liquide are the only two sources of nitrous oxide in the U.S. Airgas is the largest supplier of nitrous oxide in the U.S. and has an entire division devoted to the manufacture, transportation, and sale of nitrous oxide. Airgas has a policy in place that requires that distributors denature the nitrous oxide with sulfur dioxide prior to sales to customers for use in automotive racing. Airgas supplies customers with a written policy detailing the requirement of distributors to denature the nitrous oxide before it is sold.

34.    On February 14, 2012, CS-1 told me the following:

a.    ADVANCED GAS PRODUCTS in Huntington Beach, California purchases nitrous oxide from Airgas (outside of California) and resells it without denaturing it as required by the Airgas policy. CS-1 learned of this from an employee at the Long Beach compressed gas supplier for which CS-1 is a consultant, who is aware of the purchasing based on the transit of the truck between the third party's facility and ADVANCED GAS PRODUCTS. (On March 15, 2013, CS-1 provided the additional clarification: A number of years ago the Long Beach compressed gas supplier sold nitrous oxide to SANTA ANA SPEED. The Long Beach compressed gas supplier stopped selling to SANTA ANA SPEED because the company was concerned about the end use. Subsequent to this, SANTA ANA SPEED returned to the Long Beach compressed gas supplier and asked to purchase nitrous oxide that had not been denatured with sulfur dioxide. At this time, SANTA ANA SPEED told the employee at the

Long Beach compressed gas supplier that SANTA ANA SPEED had been purchasing nitrous oxide that had not been denatured from ADVANCED GAS PRODUCTS.)

   b.    Based upon CS-1's conversations with other individuals in the compressed gas industry, CS-1 believes that ADVANCED GAS PRODUCTS is also selling nitrous oxide that has not been denatured to SANTA ANA SPEED in Santa Ana, California.

   c.    Specialty Air Technologies in Long Beach, California sells a variety of specialty gasses and purchases nitrous oxide from Airgas.

   d.    CS-1 consults for the supplier that sells nitrous oxide denatured with sulfur dioxide to CALIFORNIA TOOL AND WELDING. This supplier purchases approximately 13,000 pounds or 200 cylinders of nitrous oxide per week from Airgas, some of which it sells to CALIFORNIA TOOL AND WELDING. In addition, CALIFORNIA TOOL AND WELDING installed a 9,000 gallon cylinder that is capable of holding nitrous oxide in its liquid form at its location in Riverside, California.

   e.    CS-1 identified CUSTOM PERFORMANCE RACING and Noswerks as two other businesses that are involved in the sale of nitrous oxide to customers for human consumption as a recreational drug. The information supplied by CS-1 with respect to these businesses is based on industry knowledge and sources, but CS-1 did not have direct knowledge of these allegations.

   f.    CS-1 identified instrumentation, medical, and automotive as the three main uses of nitrous oxide. CS-1 stated that, based on CS-1's knowledge, these three (legitimate) uses could not account for the purchase and sale of 100 cylinders per week by CALIFORNIA TOOL AND WELDING.

   g.    CS-1 stated that nitrous oxide is not used in welding.

16

h.    CS-1 has heard anecdotally that Kool-Aid is added to a cylinder before it is filled with nitrous oxide denatured with sulfur dioxide.  The Kool-Aid will mask the sulfur dioxide smell, but more importantly, the water in the Kool-Aid will absorb the sulfur dioxide leaving only sulfurous acid. Though CS-1 has not performed this process, based on CS-1's chemical engineering background, this process makes sense from a chemical reaction standpoint. It would be necessary to change out the Kool-Aid prior to refilling the cylinder because at some point the ability of the Kool-Aid to absorb the additional sulfur dioxide would decline.  CS-1 has also heard that Mountain Dew can also be used for this same purpose.  I formed the opinion, based on this statement, that nitrous oxide that contained sulfur dioxide could still be inhaled as a recreational drug.

35.    On August 2, 2012, CS-1 told me the following:

a.    CS-1 confirmed that CALIFORNIA TOOL AND WELDING installed a 9,000 gallon cylinder especially designed for the receipt and storage of nitrous oxide.  CS-1 believes that CALIFORNIA TOOL AND WELDING purchases bulk nitrous oxide along with Nitrogen, Acetylene, and Carbon Dioxide from Air Liquide in addition to the approximate 200 cylinders of denatured nitrous oxide purchased from the Long Beach compressed gas supplier for whom CS-1 consults. I think this needs to be changed for consistency with other changes made.

b.    CS-1 believes that CALIFORNIA TOOL AND WELDING may also be selling nitrous oxide to customers in Las Vegas, NV.

c.    CS-1 remarked that the owner of NITROUS TURBO SYSTEMS had approached the Long Beach compressed gas supplier for whom CS-1 is a consultant and asked an employee to purchase additional nitrous oxide because NITROUS TURBO SYSTEMS could not purchase sufficient quantities of nitrous oxide from CALIFORNIA TOOL AND WELDING.

d.      Based upon CS-1's conversations and contacts with individuals in the performance automotive racing community, CS-1 understands that a performance automotive shop supporting drivers with nitrous oxide kits may purchase and use approximately four 64-pound cylinders in a week.

36.     On December 3, 2012, CS-1 advised me that CS-1 was told by a colleague in the compressed gas business that a CALIFORNIA TOOL AND WELDING driver told the colleague that a CALIFORNIA TOOL AND WELDING Manager/Salesman located in Santa Ana, California, had visited a potential nitrous oxide customer and instructed the customer on how to remove the sulfur dioxide from denatured nitrous oxide.  The delivery driver from CALIFORNIA TOOL AND WELDING in Santa Ana told this directly to the colleague.

37.     On December 3, 2012, CS-1 confirmed that CS-1 has personal knowledge that the CALIFORNIA TOOL AND WELDING tractor trailer comes from the Riverside office and the smaller delivery trucks from the CALIFORNIA TOOL AND WELDING Santa Ana location.

38.     On February 12, 2013, CS-1 stated that many distributors use software to automate the sales and movement/inventory of cylinders.  I subsequently reviewed software available for this purpose and noted that it is available for use inside an office environment and on mobile devices.

39.     On February 12, 2013, CS-1 confirmed that based on CS-1's working knowledge and business dealings with compressed gas distributors throughout the United States, significantly more nitrous oxide is sold in the Los Angeles region than in any other comparable metropolitan area within the United States.

E.      **INFORMATION FROM CONFIDENTIAL SOURCE NUMBER TWO**

40.     Between June 13, 2012 and January 14, 2013, I have interviewed an individual known to me, but referred to herein as Confidential Source Number Two ("CS-2") on a number

of occasions, both in person and over the telephone. Throughout my investigation of this case, I have been able to corroborate information provided to me by CS-2. As a result, I believe the information provided to me by CS-2 is accurate and reliable. During these conversations, CS-2 has provided me with the following information:

      a.      The use of nitrous oxide originated as a "cheater trick" (after-market product) put on a Corvette sports car to temporarily increase the performance of the vehicle. The after-market "booster" kits add horsepower to an engine without having to incur the significant costs involved in supercharging an engine. After building a couple booster kits for friends, CS-2 and a partner started a company to sell the kits commercially. In approximately 1999, the company was sold to Holley Carburetors. Holley Carburetors has approximately 40% to 50% of the market for these booster kits. There are approximately four major manufacturers of nitrous oxide racing parts at this time.

      b.      A number of years ago, CS-2 first became aware of the problem with nitrous oxide inhalation by youth. At that time, CS-2 met with the owners of Puritan Bennett, the primary supplier of nitrous oxide (the former owner of the Richmond, California manufacturing plant purchased by Airgas and then divested to Air Liquide). The meeting was based on the fact the CS-2 had received a call from a mother telling CS-2 that her son was "stoned" on nitrous oxide. As a result of the meeting with CS-2, Puritan Bennett began putting 100 parts per million (ppm) of sulfur dioxide in the nitrous oxide to prevent inhalation as a drug. The company trade marked the name of the product as Nitrous Plus. Another supplier of nitrous oxide has followed suit by adding 100 ppm of sulfur dioxide. This company named the resulting product "Rocket Nitrous." Puritan Bennett was subsequently sold to Airgas in about 1999.

c.     CS-2 has heard that head shops know how to remove "the stink" using tubing and water to filter out the sulfur dioxide, with some of the customers requesting different Kool-Aid flavors. A kid told CS-2 that the Kool-Aid crystals are used to absorb the sulfur dioxide.

d.     The sale of nitrous oxide to customers for inhalation purposes is very lucrative. A lot of cash can be earned from such sales. CS-2 has started getting drug customers with cylinders that are out of certification or have the wrong valve. All bottles, tanks, and cylinders are required to be certified every five years.

e.     About three years ago, the owner of SANTA ANA SPEED, whom CS-2 knows as "Larry" and whom I later learned is Larry Rowenhorst, told CS-2 that he stopped purchasing nitrous oxide from their then-current source because he no longer wanted to purchase nitrous oxide with the "stink" in it, and that their then-current supplier had refused to sell "Larry" nitrous oxide without the "stink" in it. CS-2 is not sure who "Larry's" supplier is now. CS-2 recognized the name CALIFORNIA TOOL AND WELDING, but could not be sure this is "Larry's" current supplier.

f.     A few years ago, CS-2 went to SANTA ANA SPEED and observed a kid drop off a tank at SANTA ANA SPEED. "Larry" told the kid to return in an hour to pick up the tank. CS-2 observed that the tank had the wrong valve (e.g. an acetylene valve). CS-2 told Larry about the danger of using the wrong valve and the danger of selling to kids who are not racing. CS-2 could not state definitively that "Larry" knew that his customers were not using the nitrous oxide for racing, but the circumstances CS-2 observed led him to believe that Larry was selling to kids who were not involved in racing.

41.    On January 14, 2012, CS-2 advised me that most automotive racers using nitrous oxide booster kits prefer to use 10 pound bottles in their vehicles because of a desire to limit additional weight added to the vehicle (and thus limiting performance).  (I have seen the 10 pound tanks sold by Holley Carburetors and observed that they are approximately six inches to one foot in height).  Twenty pound cylinders are viewed as too heavy and generally not used in racing.  Most professional racers bring multiple 10 pound bottles to races so that they can exchange out between races.

## VI.    SPECIFIC STATEMENTS OF PROBABLE CAUSE

### A.    VICTOR WELDING SUPPLY

Search Warrant Location

| Victor Enterprises, Inc. | 1180 East 58th Street, Los Angeles, California |
| --- | --- |

Subjects for Related Criminal Complaint

| NAME | POSITION |
| --- | --- |
| William Victor | Owner and operator |
| Edward Valencia | Employee |
| Federico Valencia | Employee |

42.    On April 3, 2009, I executed a federal search warrant at the premises of Victor Enterprises, Inc. doing business as Victor Welding supply, located at 1180 East 58th Street, Los Angeles, California ("VICTOR WELDING SUPPLY").  The warrant was based on my sworn affidavit, Central District of California, Magistrate Case Number CR-09-0623M.  Pursuant to the warrant, I seized records related to the purchase and sale of nitrous oxide, computer generated invoices documenting the sale of nitrous oxide, digital computer images from five computer

systems that contained specialized software for the tracking and sale of cylinders, security camera digital videos, 78 tanks and cylinders ranging in size from 35 pound to 56 pounds, 112 tanks and cylinders ranging in size from 5 to 30 pounds and six cryogenic liquid vessels ranging in weight from 300 to over 800 pounds each.

43.    On April 3, 2009, I interviewed WILLIAM VICTOR ("VICTOR") contemporaneously with the execution of the search warrant.  WILLIAM VICTOR voluntarily provided the following information:

a.    VICTOR has been in the welding business for 43 years.  The regular business hours are Monday - Friday, 7:30 a.m. to 4:00 p.m.  Sometimes the business remains open on Fridays until 5:00 p.m. due to the number of "kids" purchasing nitrous oxide.  EDWARD VALENCIA, one of the employees, opens the business on Saturdays from 1:00 p.m. to 3:00 p.m. or 4:00 p.m.

b.    VICTOR admitted that nitrous oxide is not used in welding, and though it can be used in racing, it can be dangerous as too much will "blow" the engine.

c.    VICTOR acknowledged knowing that kids inhale nitrous oxide, and that they sell balloons of nitrous oxide at parties to make money.  VICTOR differentiated between nitrous oxide use and the use of alcohol and marijuana.  VICTOR stated he was concerned that the kids purchasing nitrous oxide would turn to marijuana and alcohol if they could not purchase nitrous oxide.  VICTOR stated that he was concerned that the kids will not have another outlet if they cannot obtain nitrous oxide.

d.    VICTOR WELDING SUPPLY employee EDWARD VALENCIA handles the front counter.  The identification of all nitrous oxide customers is checked to ensure they are over 18 years of age.  VICTOR stated the he used this age because it is the "legal age."

22

e.     VICTOR WELDING SUPPLY hired a security guard approximately one year ago. The guard works on Fridays only, and was hired due to the "211" (Penal Code Section 211 refers to Armed Robbery) problem with the "crazy kids."

f.     Sales of nitrous oxide are made during the week but most of the business is conducted on Fridays. VICTOR replied "they party" when asked specifically why the majority of the business occurred on Fridays. VICTOR admitted that the kids use the nitrous oxide to party with, but that he does not pretend to know "all" that the kids do with the gas. VICTOR asked some of the kids what they use nitrous oxide for. The kids told VICTOR that they use the nitrous oxide to "get high," but it doesn't leave any residual effect. Kids told VICTOR that they inhale a balloon and get high that lasts about a minute. After a couple breaths you are back to normal.

g.     Initially, VICTOR only sold nitrous oxide in 5, 10, and 20 pound tanks. The kids generally exchange their empty tanks for different tanks filled with nitrous oxide (similar to propane tank exchange). It is up to the customer whether they want to exchange or have their own tank filled. VICTOR stocks filled 5, 10, and 20 pound tanks.

h.     VICTOR is aware that nitrous oxide is not illegal to sell or possess, but is illegal to inhale (VICTOR was referring to California State law, not federal law).

i.     We asked him to identify other companies that were involved in the sale of nitrous oxide to kids for purposes of inhalation. VICTOR responded that he is almost sure that ADVANCED GAS PRODUCTS located at 7552 Reynolds Circle, Huntington Beach, California is involved in the same business of selling nitrous oxide to kids. VICTOR identified two other businesses as well. VICTOR estimated that nitrous oxide accounted for approximately

23

50 percent of his business. The sale of nitrous oxide to kids is a lucrative business because the welding business is down.

        j.      At the conclusion of this interview, I clearly advised VICTOR that the nitrous oxide sold by VICTOR for purposes of inhalation as a recreational drug makes the nitrous oxide a drug, and therefore subject to the Federal Food, Drug, and Cosmetic Act.

    44.    On April 3, 2009, FDA/OCI Special Agent Rick Pueschel interviewed FEDERICO VALENCIA at VICTOR WELDING SUPPLY contemporaneously with execution of the federal search warrant. Agent Pueschel advised me that FEDERICO VALENCIA told him the following:

        a.      FEDERICO VALENCIA figured the search warrant was related to the sales of nitrous oxide. The nitrous oxide had become very popular in the past two years, during which time only a small percentage of the nitrous oxide sales have been for automotive use. FEDERICO VALENCIA knew the patrons used the nitrous oxide to get high by inhaling the gas from balloons filled from the tanks purchased at VICTOR WELDING SUPPLY.

        b.      WILLIAM VICTOR, the proprietor of VICTOR WELDING SUPPLY, told VALENCIA that it was safe to inhale "NOS." However, FEDERICO VALENCIA acknowledged that there were many repeat customers and he saw the potential for addiction. FEDERICO VALENCIA heard several stories about customers fainting after inhaling the gas.

    45.    On April 3, 2009, FDA/OCI Special Agent Rick Pueschel interviewed EDWARD VALENCIA at VICTOR WELDING SUPPLY contemporaneously with execution of the search warrant. Agent Pueschel advised me that EDWARD VALENCIA told him the following:

        a.      EDWARD VALENCIA figured the warrant was being executed because of the nitrous oxide. Nitrous oxide had become very popular in the past two years. EDWARD

VALENCIA knew the customers used the nitrous oxide to get high by inhaling the gas from balloons they had filled from tanks purchased at VICTOR WELDING SUPPLY.

      b.      WILLIAM VICTOR, the proprietor of VICTOR WELDING SUPPLY, told EDWARD VALENCIA that it was safe to inhale nitrous oxide.

      c.      EDWARD VALENCIA acknowledged that there were many repeat customers and he saw the potential for addiction. Specifically, EDWARD VALENCIA recalled one occasion on which he sent away a recovering "meth addict" and refused to sell him nitrous oxide after telling the addict that he didn't need to replace one addiction with another.

46.      On November 21, 2012, I spoke with CS-1 by phone. CS-1 advised me that WILLIAM VICTOR, the owner of VICTOR WELDING SUPPLY was filling between one and four large, cryogenic liquid cylinders with nitrous oxide at the gas supplier in Long Beach, California for whom CS-1 consults. VICTOR was using 450 pound cryogenic liquid cylinders, with each having the ability to hold gas equaling approximately between six to seven 5' cylinders of nitrous oxide. VICTOR WELDING SUPPLY does not follow any set schedule, but will drop off one day and pick up the filled cylinders on the next day. The cylinders are filled with nitrous oxide denatured with sulfur dioxide added. VICTOR started purchasing from this source in or around 2010. VICTOR WELDING SUPPLY initially purchased a small amount, but over the last two years he has increased the amount purchased. Some weeks, VICTOR WELDING SUPPLY 's drivers make multiple visits to the supplier in Long Beach to drop off empty and pick-up full cryogenic liquid cylinders containing nitrous oxide.

47.      CS-1 told me that after a Fox 11 News television report aired in April 2012, concerning the actions at NITROUS TURBO SYSTEMS in Baldwin Park, on or about May 28, 2012, the Long Beach supplier provided all of its nitrous oxide customers a multipage document

that discussed the closure of NITROUS TURBO SYSTEMS and the fact that "It appears that nitrous oxide is becoming a drug of choice at the X parties being held all over Southern California. It also appears that the police and the FDA are getting involved with the problem and we should take precautions to assure we ARE NOT enabling illegal activities." The document included a request to "Please be careful with regards to whom you supply automotive nitrous oxide." "The illegal drug abuse can cause deaths, liabilities, and financial consequences as well as damage the compressed gas industry reputation." The packet included a "Customer Release of Liability" that discussed cylinder inspections and filling procedures.

48.     CS-1 told me that CS-1 had heard that subsequent to receiving this packet of information, WILLIAM VICTOR called the Long Beach supplier and asked an employee why the company sent out the notice. During this conversation, VICTOR asked the employee if it was the supplier's intent just to protect its "ass."

49.     On November 23, 2012, at approximately 1:15 p.m., I observed a male exit VICTOR WELDING SUPPLY carrying a three foot tall silver tank. The male placed the tank in the trunk and departed the area.

50.     On this same date, at approximately 2:11 p.m., I observed a male exit VICTOR WELDING SUPPLY carrying a bright blue cylinder approximately two feet tall. The male approached a car. I observed an inflated balloon being held by the driver of the car. I know, based on my training and experience, that nitrous oxide users often inhale the gas by transferring the gas from a tank, or cylinder, to a balloon and then inhaling the gas from the balloon.

51.     During this time, I observed a car that I later confirmed was registered to EDWARD VALENCIA, parked parallel to the west side of VICTOR WELDING SUPPLY.

52.     On December 31, 2012, at approximately 1:45 p.m., I observed a car that I later confirmed was registered to FEDERICO VALENCIA parked on the street in front of VICTOR WELDING SUPPLY.

53.     On February 14, 2013, Los Angeles Sheriff's Department Deputy Ashley Turner established surveillance at the same compressed gas supplier in Long Beach, California from whom VICTOR WELDING SUPPLY has purchased nitrous oxide in past. Los Angeles Sheriff's Department Deputy Turner advised me of the following:

a.     At 10:41 a.m., Deputy Turner observed a VICTOR WELDING SUPPLY truck bearing California License Plate 8P14461 ("SUBJECT VEHICLE 1") arrive at the Long Beach, California supplier. At 11:57 a.m., the truck departed the location. Visible on the truck were numerous cylinders along with three cryogenic liquid vessels all marked as containing nitrous oxide. The truck stopped at approximately four locations before arriving at VICTOR WELDING SUPPLY at approximately 1:10 p.m. At the time the truck arrived, it appeared a number of the steel cylinders had been delivered but the three cryogenic liquid vessels were still in the truck. At 1:26 p.m., while Deputy Tuner was present at the location she also observed a male carry a silver 2' tall cylinder into VICTOR WELDING SUPPLY.

//

//

B.    **CUSTOM PERFORMANCE**

**NITROUS TURBO SYSTEMS**

**MIDNIGHT SPEED**

**CM RACING**

Search Warrant Locations

| | |
|---|---|
| Custom Performance #1 | 115 East Gardena Boulevard, #1B, Gardena, California |
| Custom Performance #2 | 8540 Sepulveda Boulevard, #1A, North Hills, California |
| Midnight Speed Shop | 21422 Alameda Street, Carson, California |
| Nitrous Turbo Systems | 10372 Trask Avenue, #D, Garden Grove, California |
| CM Racing | 11616 Center Street, South Gate, California |

## NITROUS TURBO SYSTEMS

54.    On June 13, 2012, at approximately 2:30 p.m., I observed a banner reading "NITROUS TURBO SYSTEMS, NOS Re-fills Here, 10372 Trask Unit D, 714-534-RACE" affixed to a building on the north side of the 22 Freeway between Brookhurst Street and Euclid Street.

55.    On June 14, 2012, I reviewed the Internet site NITROUSTURBOSYSTEMS.COM. The site advertises "our great price of $4.00 a pound for nitrous." Business hours were listed as Tuesday-Saturday 11:00 a.m. - 11:00 p.m. and Sunday 12:00 p.m. to 6:00 p.m. I noted that the domain registration information for this Internet Site did not include a name, but rather just an address of P.O. Box 6982, San Pedro, California. I subsequently determined that this P.O. Box had been opened by Martin Marinov.

56.    On August 3, 2012, FDA/OCI Special Agent Cindy Niu and I conducted a surveillance of NITROUS TURBO SYSTEMS at 10372 Trask Avenue, Unit D, Garden Grove,

California. Beginning about 7:00 p.m., for a period of about 30 minutes, Special Agent Niu and I observed multiple vehicles enter the parking lot and park in the vicinity of Unit D.

      a.      In each instance, individual(s) were observed removing tanks from vehicles, entering NITROUS TURBO SYSTEMS with the tanks, and exiting within approximately 5 to 10 minutes with the same tanks in hand. All of the tanks were between 20 inches and three feet tall. Colors were varied (e.g., blue, green, etc.). I am aware, based on my training and experience, that tanks of this height carry approximately 20-30 pounds of gas. Due to the time that elapsed between entering and exiting NITROUS TURBO SYSTEMS, it appeared that personnel at NITROUS TURBO SYSTEMS filled the tanks while the customers waited, either inside or outside the store. The customers generally placed the tanks in the trunk of vehicles. None of these customers carried plastic bags when they left the store, suggesting that they had not purchased any items aside from nitrous oxide.

57.      On August 27, 2012, I obtained a copy of a Baldwin Park Police Department Special Investigations Unit report dated May 18, 2012. I obtained this report subsequent to viewing a Fox 11 News Report that videoed numerous young adults purchasing nitrous oxide for purposes of inhalation from that location. According to the report, Baldwin Park Code Enforcement along with officers from the Baldwin Park Police Department Special Investigations Unit responded to NITROUS TURBO SYSTEMS located at a different address, 1376 Maine Avenue, #G, Baldwin Park, California, regarding the sale of nitrous oxide without a valid business license. During the visit, an individual named Daigro Andujo advised the officers that his uncle, Luis Ascencio, owned the business. Ascencio was not present at the time and declined over the telephone to come to the business to answer questions. Accordingly, the business was closed due to its failure to have valid city business license and fire code violations.

Los Angeles County Fire Hazardous Materials was asked to respond to 18 cylinders containing nitrous oxide that were discovered on site at the time the business was closed. During the inspection, officers also noted the presence of purchase orders, currency, and at least 200-300 copies of "release of liability" forms signed by customers who had purchased nitrous oxide from the business within four to six months prior to the inspection. The release of liability form stated that the customer acknowledged that the nitrous oxide was for racing, that the customer discharged the seller and supplier from liability, and that inhalation of the nitrous oxide may be fatal.

58. On February 8, 2013, at approximately 5:00 p.m., I observed that that front door to NITROUS TURBO SYSTEMS located at 10372 Trask Avenue, Suite D, Garden Grove, California was open. Subsequent to my arrival, I observed a female going in and out of the business. I also observed that though there were numerous automotive parts stickers on the front glass door there were no parts visible inside the premises. There was simply a glass front counter in front of a closed door that based on my prior observances most likely led to the back area enclosed by a roll up garage door. Within the counter was at least one cylinder capable of holding compressed gas. I also confirmed the presence of a security video camera above the entrance door to Suite D.

59. On February 8, 2013, at approximately 6:06 p.m., I saw three men exit a car and enter the business. One of the men exited the business carrying a green 2 foot tall tank. He placed it inside the passenger side of the truck and drove away.

**CUSTOM PERFORMANCE**

60. On June 14, 2012, I heard on KNX 1070 radio that an explosion had occurred at a business behind a meat market in Los Angeles, California. One man was identified as having

been killed and another three people as having been injured. According to the report, there were "cylinders" at the location. Based on a review of press reports, it appeared the location was on Grand Street in Los Angeles, California. No further information was available at the time.

61. On August 1, 2012, I spoke with State of California Department of Industrial Relations Division of Occupational Safety and Health (Cal/OSHA) Safety Engineer Victor Copelan, who told me the following:

a. Safety Engineer Copelan identified the site of the explosion as Noswerks located at 2526 South Grand Avenue, Los Angeles, California. Safety Engineer Copelan had identified Roberto Lasarte, 31, the decedent, as the owner of Noswerks.

62. Cal/OSHA Bureau of Investigation Special Investigator Brian Baudendistel provided me with copies of documents they recovered at the scene of the explosion. I reviewed the documents and determined the following:

a. Noswerks purchased nitrous oxide from CUSTOM PERFORMANCE at 115 East Gardena Boulevard, 1B, Gardena California ("CUSTOM PERFORMANCE #1"), Cylinder Services, Inc., 8345 East Slauson Avenue, Pico Rivera, California, and CALIFORNIA TOOL AND WELDING, 201 North Main Street, Riverside, California. The invoices documenting these purchases are dated between February 29, 2012 and June 13, 2012, the date of the explosion.

63. On February 28, 2013, 2012, Cal/OSHA Bureau of Investigation Special Investigator Brian Baudendistel provided me with the original documents and digital evidence he recovered after the explosion that killed Roberto Lasarte at the Noswerks location at 2526 South Grand Ave., Los Angeles, California. Within these materials was a digital recording that had been found by Investigator Baudendistel on the cellular telephone that belonged to Lasarte. The

31

date stamp on the file indicates that the recording was made on February 1, 2012. I listened to and transcribed the recording. From listening to the recording, it appears to me that Lasarte may have inadvertently recorded himself discussing his nitrous oxide business with a friend. The following are excerpts from this recording that have relevance to this investigation:

        a.      I believe the initial company referenced by Lasarte during the conversation is CALIFORNIA TOOL AND WELDING. Based on a review of the documents provided to me by Investigator Baudendistel, I know that CALIFORNIA TOOL AND WELDING sold ten 64 pound cylinders containing nitrous oxide to Lasarte as early as February 29, 2012. Beginning in March 2012, Lasarte began purchasing nitrous oxide from CUSTOM PERFORMANCE #1. Accordingly, I believe the "middleman" described by Lasarte is Martin Marinov. My assumption is further supported by the fact that, at the time, Marinov owned not only two CUSTOM PERFORMANCE locations, but also NITROUS TURBO SYSTEMS in Baldwin Park and Garden Grove, and was involved in some manner with CM RACING. This conversation also confirms that the sale of auto parts is simply a ruse to disguise the true business, selling nitrous oxide as a recreational drug. I reviewed other evidence obtained from Investigator Brian Baudendistel that included photos taken of information contained on Lasarte's iPad. There was a note present dated "Feb 19" that read "Tab with Martin." I believe this supports my belief that the middleman mentioned by Lasarte was Martin Marinov."

        b.      From February 29, 2012 through March 7, 2012, NOSWERKS purchased nitrous oxide from CALIFORNIA TOOL AND WELDING. Each of these invoices identified the "Bill To:" as CUSTOM PERFORMANCE, 115 East Gardena Boulevard, 1B, Gardena, California and a "Ship to:" as CUSTOM PERFORMANCE at 3025 South Flower Street, Los Angeles, California. Within this eight day period, NOSWERKS purchased and received

seventy-five 56 pound and twenty 64 pound cylinders of nitrous oxide. During this same time period, NOSWERKS returned thirty-four empty 56 pound and fourteen empty 64 pound cylinders. NOSWERKS paid $75.60 per 56 pound cylinder and $86.40 per 64 pound cylinder of nitrous oxide. NOSWERKS paid $9,556.26 for 5,480 pounds of nitrous oxide during this period of time.

        c.     "Biggest mission is getting the license to be able to buy nitrous fool. That was a mission fool. I went to like seven places. Everybody turned me down. Just because it's a fucking drug now bro. So they wanted to do walk-throughs, make sure it wasn't what we were doing, you know, just selling nitrous and filtering it and shit."

        d.     "So I went to some place and paid more money so that they wouldn't give a fuck what I'm doing… Went over there and said hey this fool sent me over here. They already know what's up… They got to pretend that they don't know we're doing it, but they don't give a fuck. They don't come walk around here. So I got it there, then they found out I'm gonna be their competition… They got pissed fool. So I went and worked something out with them…I'm going through the middleman but getting it cheaper from the middleman, just because he is buying so much…and he is so happy now because now he's making money off whatever I sell."

        e.     "I'm down, fuck if somebody comes and asks me for any part. I got accounts with places. Ok. I can go through them to get shit. So go to the fucking website you know where that shit's gonna be at. See how much they are selling it for and sell it for $5 more expensive than what they are selling it for, not cheaper, because I don't give a fuck if they do buy it or not because this (nitrous oxide) is out main business."

      f.      "We got ten bottles and we finished eight of them just on Thursday, Friday, and Saturday. Ok. Barely opened. All we had was eight customers and we finished eight bottles. We sell it for $4 per pound. There's 56 pounds in each one. Do the math, yeh."

64.      On August 13, 2012, the Los Angeles County Fire Department conducted an inspection at CUSTOM PERFORMANCE #1. I have been informed that as part of this inspection, Martin Marinov completed Form 2731, in which MARINOV stated that approximately 10 - 20 cylinders containing nitrous oxide are present on site 365 days a year. Marinov identified the common name of the nitrous oxide as "Nitrous Plus." Marinov also indicated that the compressed gas contained sulfur dioxide.

65.      On August 27, 2012, I received a set of documents from Los Angeles County Fire Department, Health Hazardous Materials Division, Hazardous Materials Specialist Ruben G. Garcia Jr. Specialist Garcia had conducted an inspection of CUSTOM PERFORMANCE #1, based on a referral from Cal/OSHA. Included in the documents was a business flyer that Specialist Garcia had obtained during his inspection. The flyer advertised a variety of automotive parts include "Nitrous Systems + Refills." The flyer identified the Internet site associated with CUSTOM PERFORMANCE as cprparts.com. The flyer also identified a "#2" location at 8540 Sepulveda Boulevard, Suite 1A, North Hills, California, 818-671-5655."

66.      On August 30, 2012, at approximately 2:40 p.m., I observed a black banner with white writing affixed to the west wall of the building located at 8540 Sepulveda Boulevard, North Hills, California ("CUSTOM PERFORMANCE #2"). The banner was located above a set of glass windows on the first floor. The banner read in part "CUSTOM PERFORMANCE RACING, 818-671-5655, www.cprengines.com."

67.    On this same date, at approximately 4:40 p.m., I observed a male exit a car at CUSTOM PERFORMANCE #2, retrieve a grey tank from the trunk of the vehicle, enter and then exit the business, place the tank in the trunk, enter the vehicle, and depart the premises.

68.    On this same date, at approximately 4:50 p.m., I observed a male enter the building carrying what appeared to be a tank with a jacket draped over it. Shortly thereafter, I observed the same male exit the building using a black jacket to cover a tank. The male placed the tank in the trunk of his car and drove away.

69.    On this same date, at approximately 5:25 p.m., I observed a female place a large silver tank in the trunk of a car and drive away.

70.    On this same date, at approximately 5:56 p.m., a male exited a car carrying a small black cylinder. At approximately 5:58 the same male exited the building, placed the tank in the trunk, and departed the premises.

71.    On November 20, 2012, I accessed records maintained by the Los Angeles County Clerk. I confirmed that Martin Marinov registered the FBN CUSTOM PERFORMANCE #1 on July 29, 2011.

72.    I have been advised that on February 22, 2013, from approximately 2:00 p.m. to 4:00 p.m., Los Angeles Sheriff's Department Deputy Ashley Turner conducted surveillance at CUSTOM PERFORMANCE #1. Deputy Turner observed the following:

a.    Upon Deputy Turner's arrival she observed an armed male security guard sitting in a car. The guard was present the entire period of time that Deputy Turner observed the location. At 2:48 p.m., Deputy Turner observed a male get out of a vehicle, retrieve a tank from the trunk and enter the business. At 2:54 p.m., he returned to the vehicle with the blue tank. He

placed the blue tank in the rear passenger seat of the vehicle, and the vehicle departed the location.

　　　　b.　　At 3:12 p.m., a male and female exited a vehicle, retrieved a silver tank, and entered the business. They returned to the vehicle at 3:21 p.m., the male placed the tank in the front passenger seat and they departed the location.

　　　　c.　　At 3:13 p.m., a male exited a vehicle, carried a red tank into the business, left the business with the red tank and drove away.

　　　　d.　　Also at 3:13 p.m., a male exited a car, carried a green tank into the business, left the business with the green tank, and drove away.

　　　　e.　　I have been advised that on February 22, 2013, from approximately 1:00 p.m. to 3:00 p.m., Los Angeles Sheriff Deputy Chris Conley observed the following activities at CUSTOM PERFORMANCE #2. In each instance the person identified returned to their vehicle with the same cylinder and generally departed the location within ten minutes. All of the cylinders were between one and three feet in height:

　　　　f.　　At 1:45 p.m., a male exited a vehicle and carried a black cylinder into the business.

　　　　g.　　At 2:24 p.m., a male exited a vehicle and carried a black cylinder into the business.

　　　　h.　　At 2:42 p.m., a female exited a vehicle and carried a blue cylinder into the business.

　　　　i.　　At 2:46 p.m., a female exited a vehicle and carried a blue cylinder into the business.

36

j.        At 3:20 p.m., a male exited a vehicle and carried a blue cylinder into the business.

## MIDNIGHT SPEED SHOP

73.     On or about December 31, 2012, I reviewed records maintained by the Los Angeles County Registrar-Recorder/County Clerk.  According to these records, on June 19, 2012, Joseph Braasch registered MIDNIGHT SPEED SHOP at 21422 South Alameda Street, Long Beach, California.[2]

74.     On January 2, 2013, I spoke with Los Angeles County Fire Department, Health Hazardous Materials Division, Supervising Hazardous Materials Specialist Mario Tresierras. Mr. Tresierras advised me that he had received information from another Inspector who received information from a business owner who had been recently inspected by the Los Angeles County Fire Department Health Hazardous Materials Division.  This individual identified "Midnight Motorsports" as being involved in the sale of nitrous oxide to customers as a drug.  In addition to Midnight Motorsports, the individual also identified other targets of this investigation, including "N2O" in Garden Grove, "BPG" in Santa Ana, "CUSTOM PERFORMANCE" in Gardena, and "SPEEDWERKS" in Los Angeles as business locations also selling nitrous oxide to customers as a drug.

75.     On January 2, 2013, at approximately 3:45 p.m., I observed that the building located at 21422 South Alameda Street, Carson, California, bore a banner reading "MIDNIGHT SPEED SHOP."  The front entrance door was propped open through which I observed a number

---

[2] I subsequently also determined that the address at 21422 South Alameda receives mail addressed with the either Long Beach or Carson city along with the Zip Code 90810.  For the purposes of this affidavit, I will use the city name Carson.

of 56 pound or 64 pound cylinders inside the premises. Agent's Note: The cylinders capable of holding this amount of compressed gas are generally approximately 5 feet tall.

76.    On January 2, 2013, I observed a young male enter MIDNIGHT SPEED SHOP, carrying a two foot tall black cylinder. At approximately 3:25 p.m., this same male exited the business carrying the same cylinder, placed the cylinder in the back seat of his vehicle and departed the premises.

77.    On January 2, 2013, I observed that the front door of the business was open. A paper sign was affixed to the door which read in part "NOS, Nitrous Oxide Systems, Refills, MON - THURS 10 AM- [note, I could not read this portion of the sign], FRI-SAT 10AM - MIDNIGHT, SUNDAY 10 AM - 10PM, $4.50." A "Business Hours" placard was visible on the adjacent wrought iron that listed these same hours.

78.    On January 2, 2013, at approximately 3:45 p.m., Los Angeles County Sheriff's Department Deputies Chris Conley and Ashley Turner along with Lieutenant Rod Armalin established a surveillance at the premises. They advised me of the following:

    a.    At approximately 4:40 p.m., they observed a male exit a vehicle, retrieve a green cylinder from the back seat, and enter the store. He then left the store carrying the same green cylinder approximately ten minutes later. He placed the cylinder in the back seat of the car and departed the location. Los Angeles Sheriff's Department Deputy Conley stopped the vehicle and identified the driver and sole occupant as Oscar Molina Santos, born in 1992. Molina stated that he lives in Torrance, and that he buys nitrous oxide to inhale at home with friends. He confirmed that he purchased nitrous oxide at Midnight Speed on Alameda Street

      b.      During these observations, law enforcement officers did not observe any customers leave the premises carrying any sort of bag that would indicate an automotive part or accessory had been purchased.

79.      On January 25, 2013, I reviewed the domain registration information for the Internet site www.midnightspeedshop.net. According to these records the domain name was registered on July 19, 2012 by CUSTOM PERFORMANCE, The registrant and administrative contact information is the same. Both are identified as CUSTOM PERFORMANCE P.O. Box 6982, San Pedro, California, telephone (310)427-7486, with an email contact address of martin@cprengines.com. I subsequently looked up the same name with the extensions .com, .biz, and .org. The same registration information is connected with each of these mirror sites as well. I know from my previous work that this P.O. Box is rented and used by Martin Marinov.

## CM RACING

80.      On February 28, 2013, I reviewed a South Gate Police Department Report that described, in part, the murder of a 15 year-old girl in South Gate on March 20, 2012. On March 1, 2013, I also reviewed a Report of Interview by Los Angeles County Homicide Detective Karen Shonka . From these reports, I learned the following information:

      a.      The shooting occurred on the street in front of CM RACING located at 11616 Center Street, South Gate ("CM RACING"). Present at the time in the business was the owner, Chad McGee, an employee, Kohei Sarta, and McGee's girlfriend. Both McGee and Saruta confirmed that the suspects in the shooting had arrived at the business to purchase nitrous oxide.

81.      McGee stated to Detectives that he works on different vehicles in his business while his partner, Saruta sells nitrous oxide to customers. Saruta's job is to check identification

to make sure customers purchasing nitrous oxide are over 18 years of age and that their tank has the proper certification.

82.    On February 28, 2013, I observed a group of broken balloons on the ground behind a large dumpster approximately three blocks south of CM RACING on Dakota Avenue.

83.    On March 1, 2013, I spoke with Investigator Karen Shonka and she advised me that the Detectives had re-contacted McGee during the investigation at his business. During one of these contacts (Investigator Shonka could not recall the precise date), McGee told detectives that he earns approximately $1,800 in cash on an average Friday night from the sale of nitrous oxide. Detectives had also viewed security video tape from a nearby business. Detective Shonka described the sales of nitrous oxide like a "drive through," in that customer arrive in vehicles and wait at the gate to have their tanks filled with nitrous oxide.

84.    On March 1, 2013, from approximately 8:00 p.m. to 8:45 p.m., I conducted a brief surveillance of CM RACING.

a.    Upon my arrival I observed multiple vehicles double parked in the road adjacent to other vehicles parked on the street adjacent to the chain link fence surrounding CM RACING. I observed between 5 and 10 individuals grouped at an opening in the fence. The opening was approximately one foot wide, or in other words, wide enough to fit a compressed gas tank but not a human. During the time I observed the location, none of the customers entered the property.

b.    I observed multiple individuals arrive at the location, exit their vehicle with a variety of tanks and wait at the gate. These individuals returned to their vehicles carrying tanks and departed the location. In some instances other individuals waited in the vehicles when the tank was taken up to the gate.

40

c.     During a few minutes when customers were scarce, because there was little ambient light in the street near the fence, the lights on within the business made it possible for me to observe that both McGee and Saruta were present in the business. Due to the lighting, I was also able to observe the presence of multiple 5 foot tall cylinders which I recognized as compressed gas cylinders capable of holding 56 or 64 pounds of nitrous oxide.

d.     At approximately 12:44 p.m., I observed a driver exit a car and carry a blue tank up to the gate. The customer placed the tank next to the gate and waited. Within about a minute I observed the customer give what appeared to be some form of identification to someone on the inside of a gate within a fence that surrounded the premises. The license was subsequently handed back and the customer gave the person on the inside of the gate U.S. Currency. The person inside the gate then retrieved the tank and the customer walked across the street and sat on the railroad fence. At approximately 12:47 p.m., I observed the male walk back across the street, pick up the tank from the ground in front of the fence, enter his vehicle and exit the premises.

//

//

C.    **BPG AUTO PARTS, INC.**

**BPG PERFORMANCE**

**N2O AUTO SUPPLY**

**MAX SPEED NITROUS SUPPLY**

Search Warrant Locations

| BPG Auto Parts, Inc. | 419 West 17th Street, #A, Santa Ana, California |
|---|---|
| BPG Performance | 16303 ½ Piuma Avenue, Cerritos, California |
| N2O Auto Supply | 7221 Garden Grove Boulevard, #C, Garden Grove, California |
| Max Speed Nitrous Supply | 1550 West 6th Street, Corona, California |

## BPG AUTO PARTS, INC.

85.    Upon receipt of the November 30, 2011 complaint regarding ADVANCED GAS PRODUCTS and SANTA ANA SPEED, I conducted a number of searches using commercially available search engines. During this process, I came across a number of articles reporting the fact that 20 year old Jose Luis Gomez Nava of Santa Ana, California was arrested on November 20, 2010 on suspicion of driving under the influence in connection with a single vehicle crash that killed 16 year old Steve Gomez, and injured two other occupants. The article quoted Santa Ana Police Commander Steve Colon as stating "a preliminary investigation revealed that just prior to the accident Gomez Nava was huffing automotive grade nitrous oxide." I obtained reports from the Santa Ana Police Department regarding the accident to determine the source of the nitrous oxide.

86.    I learned the following information from the Santa Ana Police Reports. At the time the reports were written, Jose Luis Gomez Nava was unable to provide a statement due to his serious injuries. The facts were reported as follows:

a.    A 18" tall black/green cylinder that was believed to have contained nitrous oxide (but at the time of discovery had purged its contents most likely due to its ejection from the vehicle at the time of impact) was found at the site. See Exhibit 4 attached to this affidavit. The cylinder was frosted over when it was located. A black party-size balloon was also located.

b.    Roman Francisco Gomez stated that he, along with Jose Luis Gomez Nava and Steve Gomez, picked up the tank from a cousin, after which they went to an auto parts store located at 17th Street and Ross Street in Santa Ana, California to have the tank filled. Roman Gomez bought $25 worth of nitrous oxide from the auto parts store. Roman Gomez estimated that he purchased five pounds of nitrous oxide. After having the tank filled, Roman Gomez gave the tank to Steve Gomez who in turn began filling black balloons and the three immediately started inhaling the nitrous oxide. They continued to inhale nitrous oxide in this manner until the accident.

c.    Santa Ana Police Officer West Hadley determined that BPG AUTO PARTS INC. was located at the corner of 17th Street and Ross Avenue in Santa Ana, California. Officer Hadley observed that BPG AUTO PARTS INC. had numerous signs in the window advertising the sale of "NOS." Officer Hadley looked inside the window and observed 22 large industrial gas cylinders free standing on the "customer" side of the counter. Of the cylinders where Officer Hadley could read the tag, they all were identified as containing nitrous oxide. Officer Hadley observed four signs, two inside and two outside that stated that purchasers of "NOS" must have valid identification and be at least 18 years old.

d.    Santa Ana Police Department Investigator Laure Bao, Sergeant Gielda and Corporal Crews interviewed Tomas Bautista, the owner of BPG AUTO PARTS, INC. Bautista told the officers that the legal age to purchase nitrous oxide was 18, and that the store obtains

(and makes a copy) of a valid California or Government identification from buyers to verify their age. The identification is copied onto a disclaimer form that warns the buyer of legal as well as physiological ramifications of misuse of the "NO/Sulfur Dioxide" mixture. Buyers are required to sign the form before purchasing gas. A copy of the disclaimer, signed by Roman, along with a copy of his debit card receipt dated November 20, 2010 at 7:03 p.m. were obtained by the Santa Ana Police Department from a stack of similar receipts. The disclaimer stated, among other things that: (1) any person who possess nitrous oxide for the purpose of causing a condition of intoxication was guilty of a misdemeanor and (2) the person signing the disclaimer assumed responsibility to insure that the nitrous oxide would not be used for any purpose other than a means of creating additional engine performance during the course of a sanctioned motor sports event. The debit receipt bore a time stamp that indicated Roman Gomez had purchased 5 lbs. of nitrous oxide for $25 from BPG AUTO PARTS, INC. 39 minutes before the fatal accident.

87.     On January 20, 2012, FDA/OCI agents and I conducted surveillance at BPG AUTO PARTS, INC. and observed the following:

a.     At approximately 1:06 p.m., FDA/OCI Special Agents Steve Furr, Robert Iwanicki, and myself observed an open-bed 2006 International truck bearing California License Plate 7Z42153 (SUBJECT VEHICLE 4) containing multiple 5 foot tall steel cylinders and cryogenic liquid cylinders arrive at the premises. The driver and passenger doors bore the name CALIFORNIA TOOL AND WELDING.

b.     FDA/OCI Special Agent Iwanicki observed the driver unload approximately seven 5' tall cylinders, and reload 12 (believed to be empty based on the sound they made) cylinders into the truck. I observed that the cylinders were consistent with those used to transport and deliver large quantities of compressed gas. FDA/OCI Special Agent Furr and I

44

observed the truck depart the premises, and approximately ten minutes later enter the driveway at CALIFORNIA TOOL AND WELDING—SANTA ANA. FDA/OCI Special Agent Stacy Wiechec subsequently determined that the truck was registered to CALIFORNIA TOOL AND WELDING—RIVERSIDE.

   c. During the remainder of this surveillance, FDA/OCI agents and myself observed that during a two hour period, approximately 11 vehicles containing either a single driver or multiple occupants arrive and park in the lot adjacent to BPG AUTO PARTS, INC. In each instance, individual(s) were observed removing tanks from vehicles, entering BPG AUTO PARTS, INC. with the tanks, and exiting within approximately 5 to 10 minutes with the same tanks in hand. All of the tanks were between 20 inches and three feet tall. Colors were varied (e.g., black, grey, blue, bright pink, white, etc.). Due to the time that elapsed between entering and exiting BPG AUTO PARTS, INC., it appeared that personnel at BPG AUTO PARTS, INC. filled the tanks while the customers waited, either inside or outside the store. The customers generally placed the tanks in the trunk of vehicles. Individuals taking tanks in and out of the business did not have any other bags with them that would indicate they purchased any other item in addition to nitrous oxide.

   88. On August 12, 2012, at approximately 7:20 p.m., I observed an advertisement in the window of BPG AUTO PARTS, INC. The advertisement read in part "BPG and N20 will be opening a new location named BPG PERFORMANCE that will offer nitrous and Accessories. Grand Opening on August 20, 2012. Address: 1550 South Anaheim Boulevard, Unit C, Anaheim, California 92805." The advertisement included a "coupon" that read "Specials for the first 2 weeks with this flyer." The bottom of the advertisement included the addresses for BPG AUTO PARTS, INC. and N20. I also observed a notice posted on the window that read in part

"New Regulations, to Refill no: 1. After 5:00 p.m. on Fri & Sat you must be 18 & older to enter the store (anyone else must wait inside car not in front of store or in parking lot); 2. After refilling bottle, the bottle must go in trunk! Not inside car. Failure to do so will result in not being allowed to refill at either of our facilities." Another notice posted to the right of this one read "Must be 18 & over with ID to purchase no." To the left of this notice was a copy of the Orange County Register report date November 22, 2010 that described the fatal traffic accident involving Jose Luis Gomez. (I formed the opinion that by requiring that bottles be placed in trunks, the owners of BPG AUTO PARTS, INC., were trying to protect themselves from liability from accidents caused by the use of nitrous oxide while driving. I further formed the opinion that the owners of BPG AUTO PARTS, INC. therefore knew that customers intended to inhale the nitrous oxide).

89.     On February 22, 2013, from approximately 3:09 p.m. to 4:20 p.m., I observed the following activities pertinent to this investigation at BPG AUTO PARTS, INC.:

    a.     At approximately 4:13 p.m., I observed a male exit a vehicle and remove a blue tank from the trunk. Within five minutes the driver exited the business and returned to the vehicle with the tank. He placed the tank behind the driver's seat and departed the location.

    b.     At approximately 4:15 p.m., three males exited a car. One of the males retrieved a silver two foot tall tank from the trunk. All three entered the business and returned to the vehicle within five minutes. One of the males placed the tank in the trunk of the vehicle before they departed the location.

## N2O AUTO SUPPLY

90.     On June 13, 2012, at approximately 2:00 p.m., I observed that the glass door marked "C" at 7221 Garden Grove Boulevard, Garden Grove, California bore the name "N2O Auto Supply."

91.     On June 14, 2012, I located "Events" information on Facebook. The majority of the posts connected with the posting involved party locations, music, "any flavor nozz," "exclusive bottle service," etc. Another similar Garden Grove events post on the allevents.in page included the reference "People from all around the area come to fill up already in either locations bpg or n2o…" The page also referenced the fact that the business had a Facebook page under the same name. The page advertised nitrous oxide refills at $4.75 per pound. Based on my training, experience, conversations with CS-1, and review of websites, I know that the reference to "flavors" of nitrous oxide suggests that the nitrous oxide is used for inhalation and that liquids such as Kool-Aid and Mountain-Dew are added to nitrous oxide that has been denatured, to mask the scent of sulfur dioxide.

92.     On August 2, 2012, I observed that the glass door marked "C" at 7221 Garden Grove Boulevard, Garden Grove, California bore the telephone number (714)891-2288 in addition the name "N2O Auto Supply."

93.     On August 3, 2012, at approximately 2:45 p.m., FDA/OCI agents established surveillance at N2O AUTO SUPPLY and observed the following:

        a.      We observed only cylinders along the external east wall and a Jet Ski on the west wall. At this same time, Special Agent Pueschel observed customers entering the business through the glass door marked "N2O Auto Supply." It should be noted that during this

surveillance, individuals taking tanks in and out of the business did not have any other bags with them that would indicate they purchased any other item in addition to nitrous oxide.

   b.  At 2:50 p.m., Special Agent Niu observed a male and female exit a car carrying a green tank, and enter the business. At 2:55 p.m. the same subjects exited the business carrying the tank, entered their vehicle and departed.

   c.  At 2:55 p.m., Special Agent Niu observed a female driver wait in a vehicle while a male passenger entered the business carrying a tank. Special Agent Pueschel observed the male exit the business carrying a black Hefty-style plastic bag in his right hand. Special Agent Pueschel could see the outline of a tank indented against the side of the black hefty bag and observed the subject load the bag into the trunk of the vehicle and depart at 3:00 p.m.

   d.  At 3:05, a male in his late 40's or early 50's exited a vehicle and entered the business carrying a gray tank. At 4:15 p.m. the subject exited the business with the tank, entered his vehicle and departed.

   e.  At 3:15, Special Agent Pueschel observed a male driver begin backing out of the parking space as the passenger returned to the vehicle carrying a purple tank. The passenger, a young male, returned to the vehicle, smiling. The subjects exited the parking lot at 3:25 p.m.

   f.  At 3:55 p.m., I telephoned (714)891-2288, the telephone number associated with N2O AUTO SUPPLY. An unidentified female answered the telephone and I could hear male voices in the background. The unidentified female stated the business was open until 8:00 p.m.

g.      At 4:10 p.m., Special Agent Niu and I observed three males exit a vehicle with a tank and enter the business. At 4:17 p.m., the same subjects exited the business with the tank, entered their vehicle and departed.

h.      At 4:40pm Special Agent Pueschel observed a vehicle parked in the parking lot. Three males in their early 20's exited the business carrying a black tank, entered their vehicle and departed.

i.      On this same date, at approximately 7:34 p.m., I observed numerous males standing around the front door of N2O AUTO SUPPLY.

94.     On December 26, 2012, I reviewed the Facebook page for N2O Auto Supply. According to the "About" section, this page was opened in February 2011. The page contains numerous photographs of compressed gas cylinders and valves. I also viewed a photograph of a business card that included the request to "Like us on Facebook." I also observed posts providing responses that confirmed that nitrous oxide was available from BPG AUTO PARTS, INC. in Santa Ana, California. I also observed that a poster asked "Can u fill up a carbon dioxide tank. Or make it to a nozz tank." I observed posts dated October 31, 2011 inquiring if N2O filled "5 footers" and if they have "scented." N2O responded "280 to fill up a five footer ans no scented lol." Lastly, I observed that posts were marked as having been uploaded from a mobile device and other posts advised that customers could contact N2O via SMS messages.

95.     On February 8, 2013, from approximately 4:08 p.m. - 4:35 p.m., I observed multiple vehicles arrive at the location. In each instance one or multiple males exited the vehicle and carried one or more tanks into the business. In each instance the customer(s) departed within 5 - 10 minutes after arriving. Based on the carrying style and or technique, the tanks carried out of the business had been filled with nitrous oxide. It should be noted, again, that during this

period of time, individuals taking tanks in and out of the business did not have any other bags with them that would be indicative of them having purchased any other item in addition to nitrous oxide.

### BPG PERFORMANCE

96.    On November 20, 2012, I observed that BPG PERFORMANCE consisted of a unit within a light industrial complex. Similar to the other TARGET LOCATIONS I have identified, the unit had a roll up door on the back side and a regular pedestrian entrance on the front side. There were nitrous oxide signs identifying the business and the unit appeared vacant.

97.    On December 26, 2012, I observed on the Facebook page for BPG PERFORMANCE at 1/2 Piuma Avenue, Cerritos, California. The Facebook page is electronically updated on a regular basis using a digital device. Digital photographs of various cylinders have been electronically uploaded to the site as well. I observed that the Facebook page was initiated on December 20, 2012.

98.    On December 27, 2012, Special Agent Liz Nguyen-Espinoza entered BPG PERFORMANCE and spoke with a young woman. The woman told Special Agent Nguyen-Espinoza that the business had just opened approximately three to four days prior and that they sell nitrous. Special Agent Nguyen-Espinoza advised me that the front of the business was empty except for some shelves next to the bathroom and the counter behind which the woman sat. (I formed the opinion that the lack of automotive parts for sale is consistent with the operation of a sham storefront created to mask illegal distribution of nitrous oxide as a drug).

99.    On January 4, 2013, at approximately 3:10 p.m., I observed SUBJECT VEHICLE 3 exit the alley that runs along the north side of the building. This side of the building contains the garage bay access to each of the units in the building. After the truck departed I was able to

observe multiple five foot tall cylinders within the garage space contained within BPG PERFORMANCE.

100.    On this same date from approximately 4:55 p.m. until 6:00 p.m., I observed customers arrive with tanks, enter the premises for between 5 and 10 minutes, and then depart the premises. On each occasion, based on my experience and the manner in which the tanks were carried, each had been filled with compressed gas. During this time, I observed a male arrive in a vehicle. This male repeatedly entered and exited the business, spending the majority of his time smoking near the front door. At approximately 5:58 p.m., I observed a single male arrive driving a different vehicle. The driver removed a tank from the vehicle and approached the male standing out front. The male opened the door to BPG PERFORMANCE for the driver, and carried the tank through a closed door at the back of the unit. There appeared to be a glass case with a few items on display, but no other parts and/or accessories were present in the business. I formed the opinion that the male who repeatedly entered and exited the business was a security guard.

101.    On January 18, 2013, at approximately 3:15 p.m., I observed that the roll up door to the garage area within BPG was open. Through the open door I observed approximately 20 - 30 five foot tall cylinders grouped together near the open door. There were no other automotive parts visible. I also observed that in addition to the banner, the front glass door now identified the location as "BPG Cerritos" and included the term "NOS Refills Here!" I observed two males standing next to a vehicle. The males were in the process of loading a 3 foot tall cylinder painted with green and red in a swirl pattern similar to a candy cane.

## MAX SPEED NITROUS SUPPLY

102.    While reviewing the Facebook page for BPG PERFORMANCE in Anaheim, California, I observed that posts had been uploaded the referred to another location named "M/S." The posts were titled "N2O Auto Supply" and stated in part "People from all around come to fill up at any of our three locations, BPG, N2O and/or M/S..." I subsequently determined that this post also appeared on the Facebook page for BPG PERFORMANCE in Cerritos as well. This post was reposted a number of times with the most recent occurrence on December 23, 2012.

103.    I then located the Facebook page for MAX SPEED NITROUS SUPPLY. According to the Facebook page the business sells nitrous oxide at $4.75 per pound and is open for business from Tuesday - Thursday 12:00p.m. - 9:00 p.m., Friday and Saturday from 1:00 p.m. - 11:00 p.m., and Sunday from 12:00 - 5:00 p.m. The business is not open on Mondays.

104.    On November 8, 2012, I observed that MAX SPEED NITROUS SUPPLY was located in a strip mall at 1550 West 6th Avenue, Unit 102, Corona, California. The location bore a temporary banner above the windows that stated "Max Speed, NOS, Grand Opening, 951-582-0106, nitrous Accessories." The windows bore additional banners that pictured a variety of tanks and advised customers that "We sell and buy cylinders. Refills and tank repairs." The word "Refills" was bolded and italicized. I also noted that a security camera had been installed above the back entrance to the unit.

105.    On this same date, Special Agent Liz Nyugen-Espinoza observed that the inside of the unit appeared to be vacant with the exception of a couple chairs and a table. No automotive parts or accessories were visible.

106.    On February 23, 2013, at approximately 7:10 p.m., I called (951)582-0106. A male answered the telephone and stated that he was open for "NOS" refills until 11:00 p.m.

107.    On February 24, 2013, Los Angeles Sheriff's Department Sergeant Kenn Roller conducted a brief surveillance at MAX SPEED NITROUS SUPPLY and he advised me of the following:

a.    Sergeant Roller observed three to four 5' tall cylinders through the back door to the Unit.

b.    At 12:45 p.m., Sergeant Roller observed two males entering the Unit. One of the males was carrying a 1' tall blue cylinder.

c.    At 1:16 p.m., Sergeant Roller observed two males exiting the Unit. One of the males was carrying a 2' tall blue cylinder.

**D.    CALIFORNIA TOOL AND WELDING**

Search Warrant Locations

| California Tool and Welding #1 | 201 Main Street, Riverside, California |
| California Tool and Welding #2 | 1004 East First Street, Santa Ana, California |

108.    As set forth above, on December 3, 2012, CS-1 advised me that CS-1 was told by a colleague in the compressed gas business that a CALIFORNIA TOOL AND WELDING driver told the colleague that a CALIFORNIA TOOL AND WELDING Manager/Salesman located in Santa Ana, California, had visited a potential nitrous oxide customer and instructed the customer on how to remove the sulfur dioxide from denatured nitrous oxide

109.    On February 21, 2012, I confirmed the company CALIFORNIA TOOL AND WELDING is headquartered in one story 15,000 square foot building in Riverside, California at 201 North Main Street, Riverside, California ("CALIFORNIA TOOL AND WELDING –

RIVERSIDE"). The business maintains eight other locations throughout Southern California including one in Santa Ana at 1004 East First Street, Santa Ana, California ("CALIFORNIA TOOL AND WELDING – SANTA ANA"), and one in north Las Vegas, Nevada.

110. On August 2, 2012, I observed that CALIFORNIA TOOL AND WELDING has four vertical tanks installed at the 201 Main Street, Riverside, California location. The three large tanks each are labeled with the name of the gas contained within (e.g., liquid argon, liquid nitrogen, and liquid oxygen). I observed a fourth tank approximately half the size of the first three installed in front of a tank marked as containing liquid oxygen. This fourth tank did not contain an identifier as to its contents, only the CALIFORNIA TOOL AND WELDING logo and name. CS-1 later told me that this fourth tank was installed to hold 9,000 gallons of nitrous oxide.

111. On November 26, 2012, at approximately 2:07 p.m., I observed two trucks bearing the name CALIFORNIA TOOL AND WELDING at a compressed gas distributor in Long Beach, California. The smaller truck, SUBJECT VEHICLE 3, is registered to CALIFORNIA TOOL AND WELDING at 201 Main Street, Riverside, California, was parked parallel in front of the building. I observed another truck, SUBJECT VEHICLE 2, which is registered to CALIFORNIA TOOL AND WELDING at 4201 Production Ct., Las Vegas, NV. SUBJECT VEHICLE 2 backed into the drive way and then into the loading dock. I observed that the truck contained a variety of steel cylinders and cryogenic vessels. I observed that approximately 13 of the cylinders bore labels that read in part "Rocket Nitrous." SUBJECT VEHICLE 2 exited and preceded north bound on Cherry Avenue to eastbound on Highway 91, in the direction of Riverside. I observed that the truck contained a variety of steel cylinders, including over 25 marked "Rocket Nitrous."

112.    On January 4, 2013, I observed SUBJECT VEHICLE 3 exiting a gas distributor in Long Beach, California. The truck was loaded with cylinders bearing labels that indicated they contained nitrous oxide.

113.    On February 22, 2013, FDA/OCI Special Agents Steve Furr and Samanta Kelley conducted surveillance at CALIFORNIA TOOL AND WELDING located at 201 Main Street, Riverside, California.  Special Agent Furr advised me that he had observed the following:

a.    At 8:51 a.m., SUBJECT VEHICLE 5 departed CALIFORNIA TOOL AND WELDING – RIVERSIDE.  The truck was loaded with multiple steel cylinders.  I subsequently reviewed the photographs of this truck and determined based on my training and experience that at least one pallet of cylinders were labeled as containing nitrous oxide.  I subsequently confirmed that this vehicle is registered to CALIFORNIA TOOL AND WELDING--RIVERSIDE.

b.    At 9:10 a.m., SUBJECT VEHICLE 7 departed the location.  The truck was loaded with multiple steel cylinders.  I subsequently reviewed the photographs of this truck and determined based on my training and experience that at least three to four pallets of cylinders were labeled as containing nitrous oxide.  I subsequently confirmed that this vehicle is registered to Penske Truck Leasing Co., at 4000 Cline Avenue, East Chicago, IN.

c.    At 9:43 a.m., SUBJECT VEHICLE 6 departed the location.  The truck was loaded with multiple steel cylinders.  I subsequently reviewed the photographs of this truck and determined based on my training and experience that the truck was loaded with multiple cylinders labeled as containing nitrous oxide.  I subsequently confirmed that this vehicle is registered to CALIFORNIA TOOL AND WELDING--RIVERSIDE.

114.    On February 22, 2013, Special Agent Liz Nguyen-Espinoza and I established surveillance at CALIFORNIA TOOL AND WELDING SUPPLY, LLC—SANTA ANA at approximately 7:15 a.m.  We followed SUBJECT VEHICLE 3 as it departed the premises at 8:15 a.m.  I had observed this vehicle on prior occasions making deliveries of nitrous oxide to customers and picking up cylinders containing nitrous oxide from a supplier in Long Beach, CA.  I observed the truck make a delivery of cylinders labeled as containing nitrous oxide to LP Gas, Inc. at 4426 W. 1st Street, Santa Ana, CA.

## E.      LA RUSH, INC.

Search Warrant Locations

| LA Rush, Inc. #1 | 13556 Pumice Street, Norwalk, California |
|------------------|-------------------------------------------|
| LA Rush, Inc. #2 | 5717 Malabar Street, Huntington Park, California |

Subjects for Related Criminal Complaint

| **NAME** | **POSITION** |
|----------|--------------|
| Rose Marie Cuellar | Employee LA Rush, Inc. |

## **LA RUSH, INC.**

115.    On December 28, 2012, Los Angeles County Sheriff's Department Lieutenant Rod Armalin advised me that the Community Oriented Policing Services Bureau had identified LA RUSH, INC. as a possible source of nitrous oxide that they had found at a recent party to which officers had been dispatched to investigate a disturbance.  Lieutenant Armalin identified LA RUSH, INC. as located in Norwalk, California with a second location in Los Angeles, California.  On this same date I determined that LA RUSH, INC. operated at two locations, the first at 13556 Pumice Street, Norwalk, California ("LA RUSH #1"), and a second at 5717

Malabar Street, Huntington Park, California ("LA RUSH #2"). Further, I determined that LA

RUSH, INC. was registered with the California Secretary of State as a corporation on February

17, 2012. The agent for service of process was identified as Robert Ernest Cuellar.

116.    Also, on December 28, 2012, I reviewed the Internet site

www.larushautoparts.com. The internet site identified LA RUSH, INC. as having two locations:

13556 Pumice Street, Norwalk, California, and 5717 Malabar Street, Huntington Park,

California. Both locations were listed as open seven days a week. The posted schedule

identified business hours as Sunday - Wednesday 12:00 p.m. - 8:30 p.m., and Friday and

Saturday from 12:00 p.m. - 10:00 p.m. for both locations. The Internet site stated that LA

RUSH, INC. specialized in a variety of items including, but not limited to, race car seats, seat

belts, performance shocks, carbon fiber parts, mufflers, etc. The Internet site advertised the sale

if nitrous oxide in cylinders, bottles and tanks at "$5 per pound tax included Every Day, Till

Closing Time!" The site included a list of prices for new or used cylinders.

117.    On December 31, 2012, at approximately 12:15 p.m., I observed LA RUSH #1

consisted of a unit within a light industrial complex. The sign identified the unit as belonging to

LA RUSH, INC. The unit consisted of a glass entrance door and a garage bay on the left side of

the glass door. The garage bay was secured by a rollup garage door.

118.    On this same date, at approximately 1:00 p.m., I observed that LA RUSH #2

consisted of a red brick building located on the west side of Malabar Street between East 57th

Street and East 58th Street. There was a garage bay on the front of the building just south of the

front door. The bay is secured by a rollup garage door. A large banner reading in part "LA

Rush, High Performance, www.larushautoparts.com" was affixed to the iron fence that surrounds

a two car parking lot connected with the building. The bottom of the banner included logos for a

variety of automotive parts and accessory companies and includes "NOS" and "NX" (e.g., Nitrous Express).

119.    On January 4, 2013, at approximately 4:10 p.m., I observed SUBJECT VEHICLE 3 parked in front of the roll up garage door associated with LA RUSH #1. I observed the driver of the vehicle with paperwork in his hand as he entered the business. Based on my observance of this same truck on this same date an hour earlier at BPG PERFORMANCE, I had probable cause to believe that a delivery of cylinders containing nitrous oxide was made at this business on this date

120.    On this same date, at approximately 6:43 p.m., I observed a male standing next to the front door of the business at LA RUSH #1. Each time a customer arrived, this male opened the door for the customer, and occasionally followed the customer into the business. I formed the opinion that this male was employed as a security guard by LA RUSH. Through this door I observed colorful tanks placed inside a glass display case. No other car parts and/or accessories were visible.

121.    On Friday, January 11, 2013, from approximately 2:00 p.m. - 5:00 p.m., Los Angeles County Sherriff's Department Deputies Christopher Conley and Ashley Turner advised me that they conducted surveillance at LA RUSH #2.

    a.    During this surveillance, individuals taking tanks in and out of the business did not have any other bags with them that would indicate they had purchased any other item in addition to nitrous oxide.

    b.    Deputies advised me that during the surveillance, they observed multiple cars arrive and depart in quick procession. Deputies observed both males and females exit the

vehicles with tanks of varying sizes, enter and subsequently exit LA RUSH #2 between 5 and 15 minutes later.

122.    On Friday, January 25, 2013, at approximately 4:48 p.m., at LA RUSH #2, I observed a man and a woman enter the building carrying a small cylinder. At approximately 4:59, I observed a woman whom I later identified from DMV records as ROSE MARIE CUELLAR drive away in a vehicle. ROSE MARIE CUELLAR returned to the business after going through the Jack in the Box drive through. After she returned to the business, at approximately 5:46 p.m., I observed a male carrying a cylinder out of LA RUSH #2, and place the cylinder in his car. At approximately 5:55 p.m., I observed two young women carry a silver 2 -3 foot tall cylinder into LA RUSH, INC. #2. The women returned with the cylinder approximately 5 minutes later, placed the cylinder in a vehicle where a young male was waiting and return to LA RUSH #2 with a wallet/purse. During this time, I observed a security guard standing in front of the entrance and entering and exiting the business with customers.

123.    On this same date, from approximately 7:12 p.m. to 8:00 p.m., I observed multiple vehicles arrive at LA RUSH #1. In each instance one or more individuals exited the vehicle and carried one or more tanks into the business. In every instance, within approximately 5 - 10 minutes the same individuals exited the business carrying the same tank. Based on my experience and the manner in which the tanks were carried, each had been filled with nitrous oxide.

124.    On February 11, 2013, I observed the following postings on Craigslist for the Los Angeles area, dated February 6, 2013 at 4:07 p.m. The title of the listing was "nitrous oxide Refills - NOS Refill Station - $4 (Norwalk and Huntington Park) and it listed the business locations, hours, and telephone numbers for both LA RUSH, INC. locations. Within the contents

of the post, was "We do NOS REFILLS at $5 per pound." The bottom of the listing asked viewers to "Like" www.facebook.com/larushautosupply. I also located on this same date a post titled "5LB 10LB 15LB 20LB 50LB Nos tank - nitrous Bottle - Noz - $60 (Huntington Park 90255)." This post again listed both of the LA RUSH, INC. locations and provided a list of "Nos tanks" for sale.

125. On January 29, 2013, I met with a Fox 11 News Senior Producer. The Senior Producer showed me a video tape made by Fox 11 News approximately three weeks earlier on a Saturday night. Fox 11 News had sent two young women into LA RUSH #2 to converse with whomever was in the store about the purchase of nitrous oxide. The two women spoke with a young woman behind the counter (who I subsequently identified as ROSE MARIE CUELLAR). One of the women told CUELLAR that she was putting on a birthday party for her boyfriend who was a "nozzhead." The woman asked CUELLAR what she should buy for the party, would a five pound tank be sufficient? CUELLAR responded that she is not supposed to answer those types of questions, but that a five pound tank would not be enough. CUELLAR recommended that they purchase a 20 pound tank. The women talked about whether they could carry such a big tank and if it would fit in their car. CUELLAR told the women that they could definitely fit a 20 pound tank in their car and that she had a 5' tall tank in her silver sedan out front. The women asked if they would need to do anything else to which CUELLAR responded just throw a pack of balloons next to the tank and everyone would know what to do.

//

//

F.    **ADVANCED GAS PRODUCTS**

**SANTA ANA SPEED**

Search Warrant Locations

| Advanced Gas Products | 7552 Reynolds Circle, Huntington Park, California |
| Santa Ana Speed | 120 South Broadway Avenue, Santa Ana, California |

126.    As set forth in more detail above in paragraph 34(a) and 34(b), on February 14, 2012, CS-1 told me that ADVANCED GAS PRODUCTS purchased nitrous oxide from Airgas and resold it without denaturing it as required by Airgas policy.  CS-1 learned this from a third party.

127.    As set forth above in paragraph 40(e), CS-2 told me that about three years ago, "Larry," the owner of SANTA ANA SPEED, told CS-2 that he stopped purchasing nitrous oxide from their then-current source because he no longer wanted to purchase nitrous oxide with the "stink" in it, and that their then-current supplier had refused to sell Larry nitrous oxide without the "stink" in it.

128.    As sets forth in paragraph 40(f), CS-2 told me that years ago, CS-2 had told "Larry" about the dangers of selling nitrous oxide to kids who were not using it for racing.

129.    As set forth above in paragraph 43(i), in April 2009, VICTOR told me that he is almost sure that ADVANCED GAS PRODUCTS is involved in the business of selling nitrous oxide to kids.

130.    On or about November 30, 2011, I received a complaint from CS-1 alleging that a company named ADVANCED GAS PRODUCTS was supplying SANTA ANA SPEED with nitrous oxide that was in turn being sold to customers as a recreational drug.  According to the

complaint by CS-1, the nitrous oxide was ostensibly marked as "Automotive" grade, but was being sold to customers as a drug.

131.    On December 8, 2011, I reviewed the Internet site www.advancedgasproducts.com. According to the Internet site, the corporation was founded by Frank Beels and operates as an "independent welding supply and gas distributor."

132.    I reviewed documents from Air Specialty Technologies, which indicated that from January 15, 2008 through April 14, 2009, ADVANCED GAS PRODUCTS purchased approximately 174,168 pounds of nitrous oxide for $213,229 from Air Specialty Technologies. The documents also indicated that the nitrous oxide sold by Air Specialty Technology to VICTOR WELDING SUPPLY and ADVANCED GAS PRODUCTS was not denatured with sulfur dioxide.

133.    On December 8, 2011, I reviewed the Internet Site santaanaspeedcenter.net. The site identifies the business as "Your Auto Shop for Aftermarket Parts & Auto Parts for Import Cars." I determined that the domain registration was filed with Domain Privacy in Canada. I then reviewed Yelp comments related to the business. There were a number of comments that referred to the fact that there were many youths having steel tanks filled with nitrous oxide at the business. One commenter noted "out of the 15 people there I was the only one there to buy parts, the rest were raver kids buying NOS for parties."

134.    On January 4, 2012, I reviewed the Dun & Bradstreet report for SANTA ANA SPEED at 120 South Broadway, Santa Ana, California. According to this report, Larry Dean Rowenhorst is the CEO/owner of the business.

135.    On January 20, 2012, FDA/OCI agents and I conducted surveillance at SANTA ANA SPEED located at 120 South Broadway, Santa Ana, California. During this surveillance,

FDA/OCI Special Agents observed a male, approximately 25 years of age carry a bright green tank into the entrance marked with a "NOS" banner. The male subsequently exited SANTA ANA SPEED, drove directly to a private residence in Santa Ana, and carried a small duffel bag into the residence.

136.    On this same date, at approximately 4:06 p.m., FDA/OCI Special Agent Rick Pueschel and I observed a white panel van backed into the open area at SANTA ANA SPEED where agents had previously observed 5 foot tall cylinders lined against a wall through an open bay door. The powered lift gate had been lowered to the asphalt. I observed the name "Advanced," above other smaller words, on the passenger and driver doors. A green "non-flammable gas" warning placard was visible on the panel side of the truck. I heard the sound of cylinders being moved at the time the truck was parked at SANTA ANA SPEED.

137.    At approximately 4:20 p.m., Special Agent Pueschel overheard a female and three Hispanic males discuss that they had bought "tanks." The subjects exited SANTA ANA SPEED carrying a large duffle bag and departed the premises in their vehicle.

138.    On January 24, 2012, I observed SUBJECT VEHICLE 9, with the words "ADVANCED GAS PRODUCTS " visible on the passenger door, backed into a loading area on the east side of the ADVANCED GAS PRODUCTS.

139.    On January 27, 2012, FDA/OCI Special Agents and I conducted a surveillance at ADVANCED GAS PRODUCTS. FDA/OCI Special Agents and I observed a number of individuals carry tanks into ADVANCED GAS PRODUCTS and exit the business carrying either the same tank or what appeared to be a replacement tank.

140.    On August 12, 2012, I reviewed FBN records maintained by the Clerk-Recorder for Orange County, California. According to these records, Larry Dean Rowenhorst registered

the FBN, SANTA ANA SPEED CENTER, and identified the business street address as 120

South Broadway, Santa Ana, California. The registration form also identified Larry Dean

Rowenhorst as the registered owner of the business which was established on March 1, 1983.

141.    On February 22, 2013, FDA/OCI Special Agents established a surveillance at

SANTA ANA SPEED located at 120 South Broadway, Santa Ana, California. The agents

present advised me of the following:

a.        At approximately 8:03 a.m., Special Agent Brian Park observed several

men arrive at the location. These men along with a heavyset male fitting the description of Larry

Dean Rowenhorst opened the sliding metal gate that secures the premises on Broadway. After

helping with the gate, Rowenhorst walked around the block towards Walnut.

b.        At approximately 4:38 p.m., Special Agent Brian Park observed

SUBJECT VEHICLE 8 arrive at the location and back into the parking lot and park next to the

northern building. The truck bore the name "ADVANCED GAS PRODUCTS" on the side.

Within minutes of the arrival of this truck, another open bed truck containing compressed gas

cylinders arrived at the location. This truck also backed into a spot near the northern building.

The driver was observed to be wearing a shirt similar with that I had observed as worn by

CALIFORNIA TOOL AND WELDING compressed gas delivery men.

c.        At approximately 4:50 p.m., Special Agent Brian Park observed the

unloading and loading of multiple cylinders from the truck, and the subsequent departure of the

truck from the location at 5:03 p.m. The open bed truck departed prior to the departure of the

ADVANCED GAS PRODUCTS truck.

d.        At approximately 4:55 p.m., Special Agent Brian Park observed a vehicle

arrive at the location. At 5:08 p.m., Special Agent Robert Iwanicki observed the male driver

return to the vehicle carrying a 2 1/2 foot tall tank. The driver placed the tank in the vehicle and departed the location, stopping immediately at a gift shop located at 200 West 1st Street, Santa Ana, California, that sells balloons and other gifts. At approximately 5:12 p.m., Special Agent Iwanicki observed the driver stop his vehicle in the middle of the parking lot and lean over to the passenger side of the vehicle. While the driver was leaning over, an inflated red balloon appeared through the window. Special Agent Iwanicki observed the driver look at the balloon and then immediately depart the parking lot.

e.    At approximately 6:00 p.m., Special Agent Brian Park observed a vehicle arrive at the SANTA ANA SPEED door emblazoned with "NOS." Special Agent Brian Park observed a driver walk out with a tank, and depart the location, and enter the parking lot associated with the gift shop located at 200 West 1st Street, Santa Ana, California. At this time, Special Agent Brian Park observed that there was a female in the front passenger seat of the vehicle. Special Agent Robert Iwanicki observed the driver enter the same gift shop and place U.S. currency on the counter. The clerk then brought up a box containing a large back of red balloons.

## G.    SPEEDWERKS, INC.

Search Warrant Locations

| Speedwerks, Inc. | 5422 South Normandie Avenue, Los Angeles, California |
|---|---|

142.    As set forth above in paragraph 74, an unnamed owner stated that SPEEDWERKS was selling nitrous oxide as a drug.

143.    On January 2, 2013, I observed that 5422 South Normandie Avenue, Los Angeles, California consisted of a store front and adjacent garage structure secured by a rolling gate. The entire building was painted black with the name "SPEEDWERKS" on both the west side facing

Normandie Avenue and on the south side. The south side also included the term "Performance not Promises" under the name SPEEDWERKS. The front side of the business consisted of a two pane window and a glass door. The entire glass door was covered with a variety of automotive parts stickers. I also observed that video surveillance cameras were visible both above the "garage" area and the front door.

144.    On January 2, 2013, two males exited a vehicle, carrying a silver cylinder approximately 2 feet tall. They entered through the glass doors, and exited approximately five minutes later through the same door carrying the same silver cylinder. They left in their vehicle.

145.    I viewed a post dated December 2, 2012, on jlaforums.com, a website that contains a variety of information similar to Craigs List. I saw a post that stated "SPEEDWERKS, Racing Performance shop in Los Angeles.... nitrous oxide Refills," "$4.50 a pound" and the business was open "late Fridays and Saturday, Call for business hours, (323)455-9862." On this same date, at approximately 2:01 p.m., I telephoned (323) 455-9862. The man who answered the telephone told me that SPEEDWERKS was open Fridays from 12:00 p.m. - 12:00 a.m.

146.    On February 5, 2013, I reviewed a Unified Program Form and a Consolidated Contingency Plan signed by Eulalio Rodgriguez on September 11, 2012. That form stated that the business has approximately 952 pounds of nitrous oxide on site on a daily basis. Lastly, the nitrous oxide is described as being "pure." As set forth above, nitrous oxide used in the racing of cars is denatured and contains sulfur dioxide. It is not "pure."

147.    On February 7, 2013, Los Angeles County Sheriff's Department Deputy Ashley Turner and Sergeant Chris Romash conducted a surveillance at SPEEDWERKS, INC. They advised me that they observed the following activities:

a.    Four males exited a vehicle, one removed a silver tank from the rear seat, and carried it into the business. They exited the business within 5 minutes, placed the same silver tank in the rear seat and departed the location. RODRIGUEZ then locked the door and left the location at approximately 3:30 p.m. It should be noted that, again, during this surveillance, individuals taking tanks in and out of the business did not have any other bags with them that would be indicative of them having purchased any other item in addition to nitrous oxide.

## VII.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

148.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

149.    Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary

technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

150.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

151.    The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

152.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the

file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

153. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word

processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

154.    Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

155.    Off-site review of digital evidence is applicable in this instance due to the prevalent use of cellular telephones and tablet computers to not only communicate directly via audio and/or video telephone calls with customers and co-conspirators, but also to update Twitter and Facebook accounts that are used to advertise the sale of nitrous oxide to customers for

human consumption. These devices, due to their unique nature require specific forensic tools such as Farad bags in order preserve the data prior to imaging and specialized software that requires specific hardware and software licenses. Without the use of a Farad bag, the digital evidence contained on these mobile devices is subject to remote wiping. Due to the number of locations being searched and the number of digital devices I expect to encounter, I am requesting authorization to secure these digital devices along with any others that cannot be imaged on site, and transport them to the Los Angeles Field Office Seized Computer Recovery Laboratory for imaging. These devices, unless seized as an instrumentality, will be returned promptly to the owners once a successful acquisition of the data has been performed. See United States v. Tamura, 694 F.2d 591, 596 (9th Circle 1982).

156.    As has been shown in this affidavit, each of the targets involved in the direct sale of nitrous oxide to customers for the purpose of human consumption use mobile devices to not only make telephone calls but to update Facebook pages, correspond via SMS messages, post Twitter updates, and photograph images of relevance to this investigation. Along with these basic uses, the targets also use a variety of applications designed and used specifically on mobile devices. Based on my previous experience as a Seized Computer Evidence Recovery Special Agent many users no longer backup their devices on desktop or laptop computers. Accordingly, this application specific data exists only on their mobile devices. All of these programs are used to advertise the illegal sale of nitrous oxide for human consumption, correspond with customers, and coordinate with promoters hosting events at which nitrous oxide is sold by the balloon to customers. SMS messages and some of the other aforementioned information stored on cellular telephones exists only on those devices. To recover these messages along with application data requires specific equipment and the on-site acquisition is not possible due to the specialized

equipment required to recover the data. In addition to the use of mobile devices, as described in this affidavit, the larger distributors use specialized computer software to track inventory, distribution, and sales of compressed gasses to their customers. These computer systems are believed to be installed in each of the distributors. Further, I have learned through my investigation that many of the targets use automated systems to accept payment via credit or debit cards in addition to cash for the purchase of the nitrous oxide.

157.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII.   CONCLUSION

158.    Based upon my training and experience, I am aware, that it is common for businesses and individuals in business to maintain business records of business activity and past business activity, such as those described in Attachment B to this affidavit, either in written form or in computer files, at locations in which that business activity has taken place.

159.    For all the reasons described above, there is probable cause to believe that the TARGET INDIVIDUALS have committed criminal violations of the federal Food, Drug, and Cosmetic Act, specifically, the doing of any act to a drug, namely, nitrous oxide, while the drug is held for sale after the drug's shipment in interstate commerce, which results in the drug being misbranded, in violation of 21 U.S.C. § 331(k), 333(a)(1), 352(f)(1) & (2), and 353(b), and 18 U.S.C. §§ 2(a) and (b), on the dates and in the manner specifically alleged in Attachment A to the Criminal Complaint filed along with this affidavit.

160.    For all the reasons described above, there is probable cause to believe that fruits, instrumentalities, and evidence of violations of 21 U.S.C.§§ 331(k), 333(a)(1), 352(f)(1) & (2), and 353(b), and 18 U.S.C. §§ 2(a) and (b) [the doing of any act to a drug, namely, nitrous oxide,

while the drug is held for sale after the drug's shipment in interstate commerce, which results in the drug being misbranded], as described above and in Attachment B to this affidavit, will be found in a search of the specific TARGET BUSINESS and SUBJECT VEHICLES, as further described above and in Attachment A of this affidavit.

_____
LISA HARTSELL, SPECIAL AGENT
FDA/OCI

Subscribed to and sworn before me
this **18** day of MARCH, 2013.

_____
HONORABLE PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE

EXHIBIT 1

TARGET INDIVIDUALS

| ROSE MARIE CUELLAR, | 1/29/13 Fox News producer states that three weeks earlier, they sent two women into the business to converse with whomever was inside. One told the woman behind the counter (Rose Marie Cueller) that her boyfriend was a "nozhead." Cueller then stated that though she was not supposed to talk about it, she recommended that the women purchase a 20 pound tank. She further recommended that the women just throw a pack of balloons next to the tank and everyone would know what to do. |
|---|---|
| WILLIAM VICTOR | 4/3/09 Victor stated then that he knew that kids inhale nitrous oxide. Agent tells Victor that if he sells nitrous oxide for purpose of inhalation, it is subject to regulation as drug.<br>11/21/12 CS-1 stated that Victor asked Long Beach supplier of nitrous oxide why the supplier sent him a notice regarding illegal drug use and asked if it was the supplier's intent to protect its "ass." |
| FEDERICO VALENCIA, | 4/3/09 employed at VICTOR WELDING, stated that he believes the search warrant is related to nitrous oxide. Stated that he knew customers use nitrous oxide to get high.<br>12/31/12 vehicle registered to Federico Valencia observed present at VICTOR WELDING. |
| EDWARD VALENCIA | 4/3/09 employed at VICTOR WELDING, stated that he figured the warrant was being executed because of the nitrous oxide. Stated that he knew that customers used nitrous oxide to get high by inhaling the gas from balloons they had filled from tanks purchased at VICTOR WELDING.<br>11/23/12 vehicle registered to Edward Valencia observed present at the VICTOR WELDING. |

EXHIBIT 2

TARGET BUSINESSES

| ADVANCED GAS PRODUCTS, INC. | CS-1 states that company purchases nitrous oxide from Airgas and resells it without denaturing it as required by Airgas. 4/3/09 William Victor states that he is "almost sure" that company sells nitrous oxide to kids. Agent reviews documents confirming Advanced Gas Products was purchasing nitrous oxide that had not been denatured from another compressed gas supplier from 2008 to 2009. 1/20/12 and 2/22/13 AND ADVANCED GAS PRODUCTS truck observed delivering cylinders to SANTA ANA SPEED. |
|---|---|
| BGP AUTO PARTS | 11/20/10 Nava arrested for driving while under the influence of nitrous oxide, Gomez dies as a result. Witness states that they purchased nitrous oxide from 17th and Rossdale (where the company is located). During subsequent investigation, the store owner shows investigators receipt, which includes disclaimer that warns of misuse of mixture. Store advertises "NOS." 8/12/12 agent observes sign at store stating that purchaser must be 18 and older to enter and that customers must place cylinders in trunk. Next to a newspaper article describing earlier accident involving Gomez. 1/20/12 and 2/22/13 customers arrive with empty cylinders and leave with filled cylinders. An unnamed business owner states that "BPG' is selling nitrous oxide as a drug. |
| BPG PERFORMANCE | 12/27/12 Woman behind counter states that they sell nitrous oxide. 8/12/12 advertisement in the window of BPG AUTO PARTS states that "BPG and N20 will be opening a new location" at BPG PERFORMANCE. 1/4/13 surveillance: advertise "NOS refills here" and customers bring in empty cylinders and leave with filled cylinders and walk out with no bags that would include auto parts or accessories. Security guard escorts customers in and out of business. |
| CALIFORNIA TOOL AND WELDING SUPPLY – RIVERSIDE | CS-1 states that the company sells nitrous oxide to CUSTOM PERFORMANCE, NITROUS TURBO SYSTEMS, and others. |

| | Agents see trucks bearing company name delivering cylinders to TARGET BUSINESSES. <br> 8/2/12 agent goes into company and sees four tanks – only three are labeled as liquid argon, liquid nitrogen, and liquid oxygen. The fourth is not labeled but appears to be a 9,000 gallon cylinder (which is consistent with CS-1's statement regarding installation of such a cylinder for storage of nitrous oxide). |
|---|---|
| CALIFORNIA TOOL AND WELDING SUPPLY – SANTA ANA | CS-1 states that an employee of the Long Beach compressed gas supplier CS-1 consults for stated that the company manager/salesman visited customers and told them how to remove sulfur dioxide. <br> 1/20/12 & 2/22/13, agents observe trucks either departing and/or arriving before and after delivering nitrous oxide to customers. |
| CM RACING | 3/20/12 murder of girl on street. Owner (McGee) states that the suspects had been purchasing nitrous oxide. <br> 2/28/13 agent sees broken balloons three blocks south of store. <br> 3/1/13 customers arrive with empty cylinders and leave with filled cylinders. <br> Heavy volume of customers, described as "drive through" by officer. <br> 3/1/13 Owner states that he earns approximately $1,800 in cash on an average Friday night, from sale of nitrous oxide. |
| CUSTOM PERFORMANCE #1 | CS-1 states that company sells nitrous oxide to customers for human consumption (has heard this but no direct knowledge). <br> 6/14/12 explosion where Lasartes, former owner of Noswerks is killed. Investigation shows Lasartes purchased nitrous from CALIFORNIA TOOL AND WELDING and CUSTOM PERFORMANCE #1 <br> Lasarte's telephone includes a recording about middleman and purchase of nitrous oxide, which agent concludes is Marinov, owner of CUSTOM PERFORMANCE #1. <br> 8/13/12 Owner states on document that he holds 10-20 cylinders containing nitrous oxide onsite 365 days a year. <br> 2/22/13 security guard present. <br> An unnamed business owner states that company is selling nitrous oxide as a drug. <br> 2/22/13 customers observed carrying cylinders into and out of business. |

| | |
|---|---|
| CUSTOM PERFORMANCE #2 | 8/13/12 LAFD obtains flyer during in section at CUSTOM PERFORMANCE #1, stating that another location for business is at the address for CUSTOM PERFORMANCE #1.<br>8/30/12 Customers observed carrying empty cylinders into the business and leaving with filled cylinders, including one customer who walks out with jacket covering cylinder.<br>2/22/13 customers observed carrying cylinders into business. |
| LA RUSH #1 | 12/28/12, 3/02/13 and 3/9/2013, LASD says that the company was source of nitrous oxide found at underground parties at which minors were present. Website posts late store hours.<br>Building has signs outside advertising auto parts. Yet when agent looks inside, no auto parts were visible other than what was contained in display cases. Security guard present.<br>1/4/13 multiple customers observed carrying empty cylinders into and filled cylinders out business. |
| LA RUSH #2 | 1/11/13 customers arriving with empty and leaving with filled cylinders from company but walk out carrying no other plastic bags.<br>1/25/13 Security guard present.<br>1/29/13 Fox News producer states that three weeks earlier, they sent two women into the business to converse with whomever was inside. One told the woman behind the counter (Rose Marie Cueller) that her boyfriend was a "nozhead." Cueller then stated that though she was not supposed to talk about I, she recommended that the women purchase a 20 pound tank. She further recommended that the women just throw a pack of balloons next to the tank and everyone would know what to do. |
| MAX SPEED NITROUS SUPPLY | 12/13/12 Facebook post states that this company related to BPG and N2O.<br>Facebook advertisement states that business hours until 11:00 p.m. on Friday and Saturday night.<br>Security camera outside.<br>11/8/12 agent sees that the store does not sell automotive parts or accessories.<br>2/24/13 customers observed carrying cylinders into and out of business. |
| MIDNIGHT SPEED SHOP | 1/2/13 an unnamed business owner reports that "Midnight Motorcross" is involved in sale of nitrous oxide as a drug. |

| | |
|---|---|
| | 1/25/13 customer walks out of store with tank, states that he purchased nitrous oxide at store to inhale at home with friends. <br> 1/25/13 Customers leaving store with cylinders but no bags, suggesting no purchase of automotive parts <br> Domain name for store was purchased by CUSTOM PERFORMANCE. <br> 1/2/13 sign advertises NOS refills and states that on Friday and Saturday, the store is open from 10:00 to midnight. |
| N2O AUTO SUPPLY | CS-2 states that company sells nitrous oxide for drug use. <br> 6/14/12 "Events" information on Facebook states that people from all over come to fill up at "bpg" and "n2o." <br> 8/12/12 agent sees coupon from BPG that lists address for N20, indicating that N20 is related to BPG. <br> Facebook post states that business does not sell "scented" nitrous oxide, suggesting that the company knows customer is intending to use as a drug. <br> Unnamed business owner states that company is selling nitrous oxide as drug. <br> 2/18/13 High volume of customers entering with empty and exiting with filled cylinders but no plastic bags. |
| NITROUS TURBO SYSTEMS | CS-1 states that owner of company approached another gas distributor because owner could not buy enough from California Tool and Welding. <br> CS-2 states that company sells nitrous oxide for drug use. <br> Website advertises hours as being from 11:00 a.m to 11:00 p.m. Tuesday and Saturday. <br> 5/18/12 Nitrous Turbo Systems at a different location closed for failure to have a valid business license and fire code violations. <br> 8/3/12 agents observe customers leaving with tanks that are 20 to 30 inches tall, but no plastic bags. <br> 4/3/12 customers carry tanks 20" to 3' tall. <br> 2/8/13 agents observe that no auto parts present. Sees men leave with 2' tall tanks. |
| SANTA ANA SPEED | 12/8/11: Website advertises itself as "Your Auto Shop for Aftermarket Parts & Auto Parts for Import Cars." <br> CS-2 states that approximately three years ago, "Larry," the owner of company told CS-2 that he stopped purchasing nitrous oxide from a source because |

| | |
|---|---|
| | he did not want to purchase gas with the "stink" in it. A few years ago, CS-2 told the owner about the danger of selling nitrous oxide to kids who are not racing. 12/8/11 review Yelp comments that refer to many youths having steel tanks filled with nitrous oxide at the business. One noted "out of the 15 people there I was the only one there to buy parts, the rest were raver kids buying NOS for parties." 1/20/12 agents observe customers going in and coming out with cylinders. 2/22/13 customers observed carrying cylinders into and out of business, some of whom immediately proceeded to purchase balloons. |
| SPEEDWERKS, INC. | Sign advertising that it is open from 12:00 to midnight 9/11/12 document where owner states that they carry "pure" nitrous oxide. 12/2/12 Man answers telephone and states that store is open until midnight on Friday. 1/2/13 Store has auto parts stickers outside. During surveillance, see men walk in with empty and out of business with filled cylinders. Security cameras present. 2/2/13 Four men carry a cylinder into and out of business. Unnamed business owner says that "Speedworks" selling nitrous oxide as a drug. |
| VICTOR WELDING SUPPLY | 4/3/09 agent executed search at location and interviewed William Victor. Victor stated then that he knew that kids inhale nitrous oxide. Agent tells Victor that if he sells nitrous oxide for purpose of inhalation, subject to regulation as drug. 11/21/12 CS-1 states that Victor asked Long Beach supplier of nitrous oxide why the supplier sent him notice regarding illegal drug use and asked if it was the supplier's intent to protect its "ass." 11/23/12 agent sees men leaving business with tanks. Sees one man with cylinder and inflated balloon in car. |

EXHIBIT 3

SEARCH WARRANTS FOR VEHICLES

| | |
|---|---|
| California License Plate 8P14461 ("SUBJECT VEHICLE 1") | Registered to Victor Welding.<br><br>2/14/2013- the truck is observed picking up cryogenic liquid vessels containing nitrous oxide from a compressed gas supplier in Long Beach, and transporting these containers to Victor Welding Supply. |
| Nevada License Plate 48607T ("SUBJECT VEHICLE 2") | Registered to California Tool and Welding.<br><br>11/26/2012 - the truck is observed departing Long Beach compressed gas supplier with cylinders labeled as containing nitrous oxide. |
| California License Plate 7J05705 ("SUBJECT VEHICLE 3") | Registered to California Tool and Welding.<br><br>11/26/2012 - the truck is observed departing Long Beach compressed gas supplier with cylinders labeled as containing nitrous oxide.<br>1/4/2013 the truck is observed departing Long Beach compressed gas supplier with cylinders labeled as containing nitrous oxide. On same day truck observed making deliveries at BPG Performance in Cerritos, CA and LA Rush in Norwalk, CA.<br>2/8/2013, the truck is observed departing Long Beach compressed gas supplier with cylinders labeled as containing nitrous oxide.<br>2/22/2013, the truck is observed departing California Tool and Welding in Santa Ana, CA carrying cylinders labeled as containing nitrous oxide and proceeding to LP Gas in Santa Ana, CA and making a delivery of nitrous oxide. |
| California License Plate 7Z42153 ("SUBJECT VEHICLE 4") | Registered to California Tool and Welding<br><br>1/20/2012, the truck is observed making a delivery of cylinders containing nitrous oxide to BPG Auto Parts in Santa Ant, Ca.  The truck is observed returning to California Tool and Welding in Santa, Ana, CA. |
| California License Plate 9A96371("SUBJECT VEHICLE 5") | Registered to California Tool and Welding.<br><br>2/22/2013, the truck is observed departing California Tool and Welding in Riverside, CA carrying cylinders labeled as containing nitrous oxide. |
| California License Plate 6U43994 ("SUBJECT VEHICLE 6") | Registered to California Tool and Welding. |

| | 2/22/2013, the truck is observed departing California Tool and Welding in Riverside, CA carrying cylinders labeled as containing nitrous oxide. |
|---|---|
| Indiana License Plate 2018299 ("SUBJECT VEHICLE 7") | Registered to California Tool and Welding.<br><br>2/22/2013, the truck is observed departing California Tool and Welding in Riverside, CA carrying cylinders labeled as containing nitrous oxide. |
| California License Plate 7V87707 ("SUBJECT VEHICLE 8") | Registered to Advanced Gas Products.<br><br>2/22/2013, truck is observed delivering cylinders to Santa Ana Speed. |
| California License Plate 8T57075 ("SUBJECT VEHICLE 9") | Registered to Advanced Gas Products.<br><br>1/20/2012 truck is observed delivering cylinders to Santa Ana Speed. |



Exhibit 4